**In re D.H. OVERMYER TELECASTING CO., INC., Debtor and Debtor-In-Possession.**

**ROBSON, MILLER & OSSERMAN, et al, Plaintiffs,**

v.

**D.H. OVERMYER TELECASTING CO., INC., Defendant.**

Bankruptcy No. B81–00506.
Adv. No. B84–0561.

United States Bankruptcy Court, N.D. Ohio, E.D.

Aug. 26, 1987.

Alan M. Petrov, D. Cheryl Atwell, Gallagher, Sharp, Fulton & Norman, Cleveland, Ohio, for plaintiffs.

John Silas Hopkins, III, Thomas R. Lucchesi, Jennifer L. Belt, Baker & Hostetler, Cleveland, Ohio, Special Counsel for defendant-debtor.

## MEMORANDUM OF OPINION

JOHN F. RAY, Jr., Chief Judge.

This matter came on for hearing on the claim of the plaintiff, Robson, Miller & Osserman, and the objection and counterclaim of defendant, D.H. Overmyer Telecasting Co., Inc. ("Telecasting").

## FINDINGS OF FACT

### I. *The Background*

**1.1** *The Telecasting Chapter 11.* On February 6, 1981, Telecasting filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101, *et seq.* (Telecasting Chapter 11 Docket, 2/6/81 Entry, Deft. Ex. 54) Pursuant to sections 1107 and 1108, Telecasting retained possession of its assets and continued in the operation of its business as a debtor-in-possession. On April 25, 1986, the Court entered an order confirming Telecasting's amended plan of reorganization. (Telecasting Chapter 11 Docket, Entry 1421, Deft. Ex. 54)

**1.2** *The Robson Firm's Proof of Claim.* On March 23, 1981, Robson & Miller, a New York partnership comprised of Morton S. Robson and Kenneth N. Miller, filed a proof of claim in this case, seeking payment of $45,596.12 "for legal services rendered and expenses incurred" on behalf of Telecasting by Robson & Miller and its predecessor firm, Robson & Toboroff, between June, 1977 and January 31, 1981. (Robson Firm Proof of Claim, Deft. Ex. 38) The only "support" for Telecasting's alleged indebtedness to the Robson firm attached to the proof of claim was an invoice from Robson & Miller dated February 1, 1981, showing the sum of $42,973.50 due for "Total Legal Fees" and the sum of $2,622.62 due for "Total Disbursements." (Robson Firm Proof of Claim, Deft. Ex. 38, p. 2; Miller, 4 Tr. 328)

**1.3** *Telecasting's Objection and Counterclaim.* On September 18, 1984, Telecasting, in response to the proof of claim, filed an objection to claim and counterclaim alleging, *inter alia,* breach of fiduciary duty, legal malpractice, conflict of interest and fraud on the part of the Robson firm and Morton S. Robson, thereby converting the proof of claim into an adversary proceeding. (Robson Adversary Proceeding Docket, Entry 1) Bankruptcy Rule 3007. On April 18, 1986, Telecasting filed a second amended objection to claim and counterclaim seeking, *inter alia,* general damages in the amount of at least $3,500,000.00, and punitive damages in an unspec-ified amount. (Robson Adversary Proceeding Docket, Entry 102) This adversary proceeding went to trial on the Robson firm's proof of claim and Telecasting's second amended objection to claim and counterclaim.

**1.4** *The Robson Firm's Amended Proof of Claim.* On October 25, 1984, at Mr. Overmyer's criminal trial in Louisville, Kentucky, Mr. Robson provided to the government a schedule of time charges, disbursements and payments received showing time charges of $43,570.50 and disbursements of $2,691.62, a total of $46,262.12, for Telecasting work. (Louisville Government Ex. 11, Deft. Ex. 39; Louisville Transcript, Deft. Ex. 67, pp. 245–46) On the sixteenth day of trial, June 3, 1987, after resting its affirmative case, the Robson firm withdrew its amended proof of claim. (29 Tr. 3555, 3557–61) The Robson firm thereby conceded that it was not entitled to any compensation for any services performed, or claimed to have been performed, for Telecasting.

### II. *The Trial of the Adversary Proceeding*

**2.1** *The Trial.* The trial lasted 16 days, commencing on Monday, May 4, 1987, and concluding on Wednesday, June 3, 1987. During this period, 3,564 pages of proceedings were transcribed. The following witnesses were called by Telecasting:

*Jacques A. Mitchell, III,* president and chief operating officer of Houlihan/Lawrence, Inc. (Mitchell, 1 Tr. 66)

*Michael J. Carrieri,* secretary-treasurer of D.H. Overmyer Co., Inc., debtor-in-possession (Carrieri, 3 Tr. 246)

*Kenneth N. Miller, Esquire,* a partner of the law firm of Robson & Miller (Miller, 3 Tr. 286–87)

*Andrew C. Edgerton,* former director of property management for D.H. Overmyer Co., Inc., debtor-in-possession. (Edgerton, 7 Tr. 608–09)

*Morton S. Robson, Esquire,* a partner of the law firm of Robson & Miller (Robson, 9 Tr. 810)

*Ellis M. Lasberg,* a builder and developer of large multi-unit residential projects in

Westchester County, New York (Lasberg, 20 Tr. 2214)

*Eugene Albert*, a highly qualified Westchester County real estate appraiser and president of The Albert Appraisal Company, Inc. (Albert, 20 Tr. 2260; Albert Professional Qualifications, Deft. Ex. 233)

*David A. Raible*, president of D.H. Overmyer Co., Inc., debtor-in-possession (Raible, 23 Tr. 2683)

*H. Buswell Roberts, Esquire*, a partner of the law firm of Nathan & Roberts and former secretary and chairman of the Grievance Committee of the Toledo, Ohio Bar Association (Roberts, 24 Tr. 2846)

*Howard L. Klein, C.P.A.*, a partner of the accounting firm of Page, Saltz & Shamis in Beachwood, Ohio (Klein, 25 Tr. 2890)

Testimony of the following witnesses was presented by Telecasting through the reading of deposition transcripts.

*Albert M. Kaufman, Esquire*, a partner of the law firm of Ballon, Stoll & Itzler (Kaufman Dep., 16 Tr. 1702)

*Morton S. Robson, Esquire* (Robson Hadar Adversary Proceeding Dep., 16 Tr. 1707; Robson New York Dep. 17 Tr. 1819)

*Howard D. Ressler, Esquire*, formerly a partner of the Robson firm when it was known as Robson & Toboroff (Ressler New York Dep., 25 Tr. 2973; Ressler Dep., 25 Tr. 2987)

*Michael J. Venditto, Esquire*, a former associate of the Robson firm (Venditto Dep., 25 Tr. 3020)

Testimony of the following witnesses was presented by Telecasting through the reading of transcripts of prior trials:

*Morton S. Robson, Esquire* (Robson Pro Haec Vice Testimony, 16 Tr. 1709; Robson Louisville Testimony, 16 Tr. 1787; Robson New York Fee Trial Testimony, 17 Tr. 1886)

*Howard C. Cook, Esquire*, deceased, former trustee of the Harrison M. Overmyer Trust. (6/20/83 Cook Hadar Adversary Proceeding Testimony, 27 Tr. 3219; 7/19/83 Cook Hadar Adversary Proceeding Testimony, 27 Tr. 3234;

7/8/83 Mitchell-Cook Telephone Call Recording, 27 Tr. 3252)

The following witness was called by the Robson firm:

*Kenneth N. Miller, Esquire* (Miller, 27 Tr. 3284) Testimony of the following witnesses was presented by the Robson firm through the reading of deposition transcripts:

*Michael J. Venditto, Esquire* (Venditto Dep., 29 Tr. 3509; Venditto Second Dep., 29 Tr. 3528)

*Howard D. Ressler, Esquire* (Ressler New York Dep., 29 Tr. 3531; Ressler Dep., 29 Tr. 3536)

Testimony of the following witness was presented by the Robson firm through the reading of a transcript of a prior trial:

*Edmund M. Connery, Esquire*, former Overmyer house counsel (Connery Hadar Adversary Proceeding Testimony, 28 Tr. 3454)

### 2.2 *The Parties.*

a. *The Plaintiffs.* The plaintiffs in this adversary proceeding are Robson & Miller, formerly known as Robson Miller & Osserman, formerly known as Robson & Miller, formerly known as Robson & Toboroff (the "Robson Firm"), Morton S. Robson, Kenneth N. Miller and Richard A. Osserman.

b. *The Defendant.* The defendant in this adversary proceeding is D.H. Overmyer Telecasting Co., Inc.

### III. *Ballon, Stoll & Itzler*

3.1 *Mr. Robson's Background.* Mr. Robson graduated from St. John's University Law School in 1949 and thereafter engaged in the private practice of law. (Robson, 9 Tr. 811) From 1950 through 1953, Mr. Robson was a partner with his brother, Eugene, in the firm of Robson & Robson. (Robson, 9 Tr. 812) From 1953 through 1961, Mr. Robson was an attorney with the United States Attorney's office for the Southern District of New York, and served as interim United States Attorney for four months between S. Hazard Gillespie and Robert Morgenthau. (Robson, 9 Tr. 812–14) In 1961, Mr. Robson reentered the private practice of law as a partner with the law firm of Marshall, Bratter,

Greene, Allison & Tucker in New York, New York. (Robson, 9 Tr. 814) In 1969, Mr. Robson left Marshall Bratter and practiced law with an associate for approximately a year. (Robson, 9 Tr. 815) Thereafter, Mr. Robson was a partner in the firm of Stanger & Robson for one and one-half years. (Robson, 9 Tr. 816) Upon the dissolution of Stanger & Robson, Mr. Robson became a partner in the firm of Zissu, Halper & Martin, which changed its name to Zissu, Lore, Halper & Robson. (Robson, 9 Tr. 817) Mr. Robson's association with Zissu Lore lasted approximately four years; he left that firm because he was "unable to deal with [his] co-managing partner whose personality [he] found very difficult." (Robson, 9 Tr. 817) In early 1976, Mr. Robson joined the law firm of Ballon, Stoll & Itzler. (Robson, 9 Tr. 818) By his own admission, Mr. Robson is not a bankruptcy expert. (Robson, 9 Tr. 841, 11 Tr. 1069, 1089, 14 Tr. 1454, Robson New York Dep., 17 Tr. 1823)

3.2 *Mr. Robson's Association with Daniel Harrison Overmyer.* Mr. Robson first became involved in representing Daniel H. Overmyer at the time that Mr. Robson was with Ballon, Stoll & Itzler. (Robson, 9 Tr. 900–01) Mr. Overmyer controlled a system of warehouses and a Toledo, Ohio television station, both of which were in Chapter XI. (Robson, 9 Tr. 823–24, 13 Tr. 1398–99, 14 Tr. 1507–08) *See generally Hadar Leasing International Co. v. D.H. Overmyer Telecasting Co. (In re D.H. Overmyer Telecasting Co.)*, 23 B.R. 823 (Bankr. N.D.Ohio 1982) (*"Hadar Decision"*), aff'd, 53 B.R. 963 (N.D.Ohio 1984), *aff'd mem.,* 787 F.2d 589, 590 (6th Cir.1986) (3/7/86 Court of Appeals Decision, Deft. Ex. 227). Mr. Robson has described Mr. Overmyer as "a very creative man who literally has made fortunes for himself over his lifetime." (Robson Opening Statement, Robson New York Fee Trial, 17 Tr. 1904; *see* Mitchell, 1 Tr. 73) "Mr. Overmyer called me at home and spoke to me for between half an hour and an hour literally every single night of the week for years.... Mr. Overmyer called our office two or three times a day and always asked to speak to me if I was there ... there was hardly a day in my

life during seven years when I didn't speak with or meet with Mr. Overmyer...." (Robson Opening Statement, Robson New York Fee Trial, 17 Tr. 1898–99) "[O]nce I started representing Mr. Overmyer, there was hardly a day in my life when I didn't spend some time talking to him. Mr. Overmyer became enamored of my ability...." (Robson Opening Statement, Robson New York Fee Trial, 17 Tr. 1903) "Mr. Overmyer indicated he wanted me to be his attorney for all things...." (Robson Opening Statement, Robson New York Fee Trial, 17 Tr. 1904) Other persons were frequently excluded from telephone conferences and meetings between Mr. Overmyer and Mr. Robson. (Edgerton, 7 Tr. 618; Raible, 23 Tr. 2688–89; Mitchell, 2 Tr. 177–78; Ressler Dep., 25 Tr. 3008–09; Venditto Dep., 29 Tr. 3511) In addition to working on Mr. Overmyer's Chapter XI proceedings, Mr. Robson also advised Mr. Overmyer with respect to: potential acquisitions, a potential public offering and financial problems for Peerless Manufacturing Corporation, an Overmyer company; a Chapter XI filing for Gulf Manufacturing Company, another Overmyer company; P & F Industries; Vornado; Schenleys; securities and litigation matters for R.T. Systems, Inc., a public company controlled by Mr. Overmyer; American Export Lines; Isbrantsen; Allan Wood Steel; Searle; personal tax problems; the Committee To Eliminate Waste and Inefficiency in Government, a committee to elect Mr. Overmyer Vice President of the United States; an attempted purchase of the Chrysler Building that was proposed by Mr. Robson; Jacques A. Mitchell Realty Corp.; General Real Estate Funding Corp.; purchase of the Houlihan real estate agency in Westchester County; an effort to extricate American Guaranty Financial Corporation, a small Oregon life insurance company, from a disastrous coal port venture; and Fremont Energy Corporation, a Denver oil company that was in financial difficulty. (Robson, 12 Tr. 1168–78, 1193–97; Robson Louisville Testimony, 16 Tr. 1791; Robson Opening Statement, Robson New York Fee Trial, 17 Tr. 1904; Mitchell, 2 Tr. 165–66, 168–72; 11/18/77 Robson Firm Time Slip, Deft. Ex. 106; 9/23/80

Robson Firm Time Slip, Deft. Ex. 107) Mr. Overmyer never made business decisions until after consulting with Mr. Robson. (Mitchell, 2 Tr. 177–78) It was Mr. Overmyer's instruction that whenever any legal matter arrived at the Overmyer office, it was to be photocopied and messengered to Mr. Robson immediately. (Raible, 23 Tr. 2690) Mr. Robson allowed Mr. Overmyer to set up offices in the Robson & Miller conference room after The First National Bank of Boston ("FNBB") took over the Overmyer offices on July 14, 1983. (Robson, 12 Tr. 1197, 21 Tr. 2498–99; Miller, 27 Tr. 3352–55; Mitchell, 2 Tr. 189–91) Mr. Robson telephoned Mr. Overmyer to congratulate him on his directed acquittal of criminal charges, after Mr. Overmyer had been found guilty by a jury in Akron, Ohio. (Robson, 12 Tr. 1198) Mr. Robson was a guest at a number of social functions at Mr. Overmyer's home in Chappaqua, Westchester County, New York, and at his daughter's home next door. (Robson, 14 Tr. 1452–53; Raible, 23 Tr. 2690–91)

3.3 *The $10,000.00 Telecasting Retainer.* On September 9, 1976, Telecasting filed a "Petition" for the retention of Ballon, Stoll & Itzler as "special counsel" in the Telecasting Chapter XI supported by an affidavit of Mr. Robson. (9/9/76 Ballon Stoll Retention "Petition," Deft. Ex. 35; 9/9/76 Robson Ballon Stoll Retention Affidavit, Deft. Ex. 36) The "Petition" requested authorization to pay Ballon, Stoll & Itzler "an advance retainer of $10,000 against the rendition of services performed and to be performed, providing, however, that [Ballon, Stoll & Itzler] shall be accountable to [the] Court for the total value of the services rendered and to be rendered and upon the determination of such services as special counsel be authorized to make an application for allowances for all the services rendered to the debtor-in-possession." (9/9/76 Ballon Stoll Retention "Petition," para. 9, Deft. Ex. 35, p. 3) Mr. Robson personally represented under oath in his affidavit that "[y]our deponent [*i.e.,* Morton S. Robson] is requesting ... that your deponent's firm be accountable to the Court for the value of the services rendered and to be rendered...." (9/9/76

Robson Ballon Stoll Retention Affidavit, para. 11, Deft. Ex. 36, p. 3) On September 10, 1976, the Bankruptcy Court entered an order authorizing the retention of Ballon, Stoll & Itzler as special counsel in the Telecasting Chapter XI, authorizing Telecasting to pay the requested $10,000.00 retainer, and directing Ballon, Stoll & Itzler to file a fee application upon completion of the services. (9/10/76 Ballon Stoll Retention Order, Deft. Ex. 37, p. 1) Telecasting paid the $10,000.00 retainer to Ballon, Stoll & Itzler. (Klein, 25 Tr. 2896–98; 8/25/76—9/30/76 Telecasting Operating Statement, Deft. Ex. 287, pp. 2, 3; *see* Robson, 9 Tr. 846–48; 9/29/76 Telecasting XI Transcript, Deft. Ex. 81, p. 8) On September 29, 1976, at the first meeting of creditors in the Telecasting Chapter XI, Bankruptcy Judge Roy Babitt told Mr. Robson in no uncertain terms that the retainer would be ordered to be repaid if it was not justified by an eventual fee application: "On further application the Court could at that time allocate. It can also ask that the ten thousand dollars be returned according to the same application and the order." (Robson, 9 Tr. 874–76, 11 Tr. 1112; 9/29/76 Telecasting XI Transcript, Deft. Ex. 81, p. 9) In his September 9, 1976 affidavit in support of the Ballon, Stoll & Itzler retention, Mr. Robson represented to the New York Bankruptcy Court under oath: "I am a member of the law firm of Ballon, Stoll & Itzler...." (9/9/76 Robson Ballon Stoll Retention Affidavit, para. 2, Deft. Ex. 36, p. 1) Mr. Robson repeated the representation to the New York Bankruptcy Court that he was "a member of the firm" of Ballon, Stoll & Itzler in various other affidavits and pleadings. (3/2/77 Robson Affidavit in Opposition to Motion To Quash Subpoena, para. 1, Deft. Ex. 83, p. 1; 2/28/77 Ballon Stoll Application for Leave To Apply for Ancillary Examination of George Bruns, Deft. Ex. 84, p. 3; 4/77 Stipulation and Order, Deft. Ex. 85, p. 2; 6/9/77 Robson Affidavit To Substitute the Robson Firm for Ballon Stoll, Deft. Ex. 34; Robson, 9 Tr. 857–63) In an affidavit filed in support of the plaintiff's motion for summary judgment in this case, Mr. Robson swore that he was "a contract partner, not

an equity partner" in Ballon, Stoll & Itzler. (3/20/86 Robson Affidavit, para. 2, Deft. Ex. 86, p. 1; Robson, 9 Tr. 864–67) Mr. Robson also testified at trial that he was "a contract or nonequity partner" and that he was "a member of the firm." (Robson, 9 Tr. 818, 820, 868–69) In fact, Mr. Robson was "an associate of the firm" and was "not a member of the firm." (Kaufman Dep., 16 Tr. 1703, 1704) Although he was only an associate, Mr. Robson made the decisions regarding Overmyer matters at Ballon, Stoll & Itzler. (Ressler Dep., 25 Tr. 3007) Ballon, Stoll & Itzler never filed a fee application in the Telecasting Chapter XI, and never accounted for the $10,000.00 retainer or any portion thereof. (Robson, 9 Tr. 848) The plaintiffs offered no evidence that Ballon, Stoll & Itzler ever performed any services for Telecasting.

3.4 *The Scope of the Ballon, Stoll & Itzler Telecasting Retention.* The "Petition" to retain Ballon, Stoll & Itzler described the scope of the services to be rendered as follows: "to represent [Telecasting] as special counsel in connection with pending litigation with the First National Bank of Boston and more particularly at this juncture to litigate an application to vacate a stay effective against the Bank, from foreclosing its alleged security interest on the shares of the capital stock of [Telecasting]." (9/9/76 Ballon Stoll Retention "Petition," para. 3, Deft. Ex. 35, p. 1; Robson, 10 Tr. 1009–10, 11 Tr. 1067–73) The stay referred to was the automatic stay of The Overmyer Company, Inc. ("TOC"), not the Telecasting stay. (Robson, 11 Tr. 1089, 1091) The retention "Petition" further defined the scope of services as follows: "to act as special counsel to litigate said matter [*i.e.*, the FNBB application for relief from the TOC stay] and to otherwise oversee the Chapter XI case as special counsel where said firm may be required or requested to do so as well as to participate as such on behalf of [Telecasting] in this matter and in The Overmyer Company and D.H. Overmyer Co., Inc. cases presently pending before this Court wherein Robert Herzog is the Receiver." (9/9/76 Ballon Stoll Retention "Petition," para. 5, Deft. Ex. 35, p. 2; Robson, 10 Tr.

1010–13) The order retaining Ballon, Stoll & Itzler as special counsel for Telecasting specified that Telecasting was "authorized and empowered to retain the law firm of Ballon, Stoll & Itzler as special counsel for services to be rendered to the debtor-in-possession in connection with a certain proceeding and litigation pending before this Court involving the First National Bank of Boston and for any other services to be rendered to the debtor-in-possession as may be required or requested by [Telecasting]." (9/10/76 Ballon Stoll Retention Order, Deft. Ex. 37, p. 1)

IV. *Third-Party Payments to the Robson Firm*

4.1 *The Formation of the Robson Firm.* Mr. Robson's association with Ballon, Stoll & Itzler lasted only one year and three months. (Robson, 9 Tr. 818, 876–77) On June 1, 1977, because of dissatisfaction with associate salaries, Mr. Robson left Ballon, Stoll & Itzler with Leonard Toboroff and two young associates, Howard D. Ressler and Kenneth N. Miller, and together they formed the firm of Robson & Toboroff. (Robson, 9 Tr. 818, 877; Miller, 3 Tr. 291)

4.2 *The Substitution of Robson & Toboroff for Ballon, Stoll & Itzler.* On June 9, 1977, Robson & Toboroff was substituted by stipulation for Ballon, Stoll & Itzler as special counsel for Telecasting in the Telecasting Chapter XI. (6/9/77 Stipulation Substituting the Robson Firm for Ballon Stoll, Deft. Exs. 33, 180; 6/9/77 Robson Affidavit To Substitute the Robson Firm for Ballon Stoll, Deft. Ex. 34; Robson, 10 Tr. 1003; Miller, 3 Tr. 315) The scope of the Robson Firm's retention was therefore identical to that of Ballon, Stoll & Itzler. (Robson, 10 Tr. 1004, Miller, 3 Tr. 315)

4.3 *Work Beyond the Scope of Retention.* Mr. Robson has systematically ignored the limitations on the scope of the Robson Firm's retention as special counsel to Telecasting. (*See* Findings 3.5, 4.2, *supra*.) Mr. Robson acknowledged that his retention was "somewhat more restrictive than all litigation." (Robson, 10 Tr. 1006) Nonetheless, he read the scope of his reten-

tion expansively to include litigation "and other matters as required," and to extend to "any matter at all" in the Telecasting Chapter XI. (Robson, 10 Tr. 1005, 1009, 13 Tr. 1391; *see* Robson, 11 Tr. 1066–67.) By April 3, 1978, the Robson Firm was performing almost as many bankruptcy services as Finley Kumble, Telecasting's general bankruptcy counsel. (Robson, 13 Tr. 1390; *see* Robson, 11 Tr. 1063–64, 1124.)

4.4 *The Third-Party Payments.* The Robson Firm received $359,935.96 from a variety of companies controlled by Mr. Overmyer, little or none of which bears any relationship to the time charge value of services performed by the Robson Firm for the company making the payments. (Robson Firm Schedule of Time Charges and Payments, Deft. Ex. 65, pp. 9, 12) These payments began the month that the Robson Firm began business and continued for six years. (Robson Firm Schedule of Time Charges and Payments, Deft. Ex. 65, pp. 1–7; Robson, Miller & Osserman Second Amended Interrogatory Answers, Ex. A, Deft. Ex. 23, pp. 8–17) For example, the Robson Firm received $100,000.00 from Peerless Manufacturing Corporation against only $2,405.00 of total time charge values. (Robson Firm Schedule of Time Charges and Payments, Deft. Ex. 65, p. 10; Robson, 13 Tr. 1301) Although Mr. Robson claimed that the Robson Firm had additional unrecorded time charges, he admitted that there was a large disparity between the amount received and the amount of time spent. (Robson, 13 Tr. 1301; *see* Miller, 27 Tr. 3383–90, 3392–96) A purported calculation of this unrecorded time was left behind in New York when Mr. Robson and Mr. Miller came to Cleveland to testify. (Robson, 18 Tr. 2095, Miller, 27 Tr. 3392–93) The Robson Firm received $69,000.00 of the $100,000.00 from Peerless Manufacturing Corporation after Mr. Robson began consulting with Mr. Overmyer about filing a Chapter XI petition for that company. (Robson, 13 Tr. 1293–96; Robson Firm Peerless Time Charges, 5/19/78 Robson Entry, Deft. Ex. 68, p. 1) Mr. Robson admitted that payments received by the Robson Firm from Spectrum Development Company, Peerless Manufacturing Corpo-

ration, R.T. Systems, Inc., AGG Projects, Inc., Jeebs Distribution Services, Inc., Omega Executive Services, Inc., Morton Telecasting, Inc., General Real Estate Funding Corp., Jacques A. Mitchell Realty Corp. and A.T. Houlihan, Inc., all Overmyer-controlled companies, were retainers for work performed for Mr. Overmyer and his companies in general. (Robson, 8 Tr. 730–34, 13 Tr. 1304–08; *cf.* Robson Louisville Testimony, 16 Tr. 1789) At least $12,500.00 of payments by R.T. Systems was applied against invoices rendered by the Robson Firm to Peerless Manufacturing Corporation. (Klein, 25 Tr. 2905) The Robson Firm billed all its disbursements, including disbursements incurred in the Telecasting Chapter XI and disbursements incurred in the Warehouse Chapter XI of D.H. Overmyer Co., Inc. ("DHO Co." or "the Consolidated Debtors"), to Peerless Manufacturing Corporation. (3/1/78 Robson Firm Bill to Peerless, Deft. Ex. 170, pp. 2–4; Robson, 22 Tr. 2578–85; Robson New York Dep., 17 Tr. 1832–39) On one occasion these Chapter XI disbursements were paid out of funds removed by Mr. Overmyer from Telecasting by means of a Telecasting check to Hadar Leasing International Co., Inc. ("Hadar"), followed by a Hadar check to AGG Projects, Inc., followed by a check of AGG Projects, Inc. to the Robson Firm, drawn on an AGG account that was never recorded on the AGG books. (Klein, 25 Tr. 2900–05; 4/19/78 $10,000 AGG Check to Robson & Toboroff, Deft. Ex. 288; 4/18/78 Connery Memo to Overmyer with Handwritten Notations of Connery and Overmyer, Deft. Ex. 170, p. 1; Raible, 23 Tr. 2742–45) *See Hadar Decision,* 23 B.R. at 871–73, Finding 22 on the Matching Checks Scheme.

4.5 *Third-Party Payments To Other Attorneys for Chapter XI and Chapter 11 Work.* Mr. Overmyer paid $5,000.00 out of Omega Executive Services, Inc. to Wisehart, Friou & Koch for representing the creditors' committee in the Hadar Chapter 11 in New York, before the case was transferred to Cleveland. (Carrieri, 3 Tr. 269–72; Raible, 23 Tr. 2719–22; 4/16/81 $2,500 Omega Request for Payment to Wisehart, Friou & Koch, Deft. Ex. 29; 4/16/81 $2,500

Omega Check to Wisehart, Friou & Koch, Deft. Ex. 32; 5/1/81 $2,500 Omega Request for Payment to Wisehart, Friou & Koch, Deft. Ex. 30; 5/1/81 $2,500 Omega Check to Wisehart, Friou & Koch, Deft. Ex. 31) Mr. Overmyer paid approximately $30,000.00 out of R.T. Systems, Inc. and its subsidiaries to Harry Margolis, attorney for the creditors' committee in the Warehouse Chapter XI. (Raible, 23 Tr. 2693–95, 2718; 3/13/81 $1,000 TOFC Checks to Margolis, Deft. Ex. 281) Mr. Margolis did nothing for R.T. Systems, Inc. and its subsidiaries except to make a single one-day trip to Chicago. (Raible, 23 Tr. 2707–08) Mr. Overmyer also entered into an agreement with Mr. Margolis to pay him an additional $75,000.00 out of Antares International Corporation, an Overmyer company. (Raible, 23 Tr. 2713–17; 9/25/79 Antares Letter to Margolis with Connery and Overmyer Handwritten Notes on Drafts, Deft. Ex. 284) Mr. Margolis, who had never turned the money in to his firm, was required personally to return the $30,000.00 to DHO Co. (Raible, 23 Tr. 2718)

4.6 *The Robson-Overmyer Retainer Agreement.* Early in the existence of the Robson Firm, Mr. Robson entered into an oral agreement with Mr. Overmyer that Mr. Overmyer would pay to the Robson Firm a retainer, initially of $5,000.00 per month and later of $10,000.00 per month, from any non-Chapter XI Overmyer company for all work being done by the Robson Firm for Mr. Overmyer or any Overmyer company, including the Chapter XI debtors, DHO Co. and Telecasting. (Ressler New York Dep., 25 Tr. 2978–79, 2981–86; Ressler Dep., 25 Tr. 2990–94, 3003–07) Mr. Ressler's description of the agreement is completely credible: Mr. Ressler, then a young associate without the supervision of a senior bankruptcy attorney (Robson, 9 Tr. 841, 878, 10 Tr. 988–89, 11 Tr. 1069, 1089, 14 Tr. 1454, Robson New York Dep., 17 Tr. 1823), thought at the time it was proper to receive third-party payments for Chapter XI work without disclosure to the bankruptcy court. (Ressler Dep., 25 Tr. 3001–03) As late as September 3, 1982, Mr. Robson wrote a letter to Mr. Connery, Mr. Overmyer's house counsel, giving his opinion that DHO Co. could retain an accountant and pay him out of third-party sources without application to the bankruptcy court for his retention or disclosure to the bankruptcy court of the third-party payments. (Robson, 18 Tr. 2024–35; 9/3/82 Robson Opinion Letter to Connery, Deft. Ex. 195) At Mr. Overmyer's criminal trial in Louisville, Kentucky, Mr. Robson testified that the retainer agreement was entered into in late 1977 or early 1978, after Mr. Overmyer acquired Peerless Manufacturing Corporation (Robson, Louisville Testimony, 16 Tr. 1789–91), and described the agreement in such a way as to imply that the Peerless retainer payments were intended for Peerless work only (Robson Louisville Testimony, 16 Tr. 1789–99, 1812–15). Mr. Robson also testified in Louisville that Peerless Manufacturing Corporation was the only Overmyer retainer (Robson Louisville Testimony, 16 Tr. 1789) and that "[p]rior to that, most of my work was with respect to corporations that were Chapter XI debtors in which I was retained as special counsel and you cannot get a retainer from a Chapter XI debtor" (Robson Louisville Transcript, 16 Tr. 1790). At trial, Mr. Robson and Mr. Miller both testified that the Overmyer retainer was limited to non-Chapter XI work. (Robson, 13 Tr. 1266–68; Miller, 6 Tr. 597–98, 7 Tr. 658–59, 693–95) This story was contrived after the creditors' committee and the custodial receiver in the Warehouse Chapter XI attacked the Robson Firm's fees on the ground of the failure to disclose the third-party payments. (Robson, 13 Tr. 1288–89; Robson New York Dep., 17 Tr. 1819–25, 1840–41, 1844–48, 1852–53) Mr. Robson testified in a deposition in connection with the Robson Firm's Warehouse Chapter XI fee application that his brother, Eugene Robson, who was then deceased, was one of the people who knew about the arrangement. (Robson New York Dep., 17 Tr. 1824, 1852–53; Robson, 13 Tr. 1320–22; Miller, 8 Tr. 756–57) The clearest proof that the limitation of the retainer to non-Chapter XI work is a recent contrivance is that there would be no reason for either Mr. Overmyer or Mr. Robson to have specified such a limitation, given the facts (a) that Mr. Overmyer had no

compunctions about making third-party payments for Chapter XI work (*see* Finding 4.5, *supra*) and (b) that Mr. Robson was unaware of any restrictions on third-party payments for Chapter XI work at least as late as September 3, 1982 (Robson, 18 Tr. 2024–35; 9/3/82 Robson Opinion Letter to Connery, Deft. Ex. 195). The Robson Firm never disclosed the Robson-Overmyer retainer agreement to the bankruptcy court prior to the New York fee litigation. (Robson, 13 Tr. 1289; *cf.* Robson, Miller & Osserman Final DHO Co. Fee Application, Deft. Ex. 265 [containing no mention of third-party payments]) The $359,935.96 received by the Robson Firm from third-party Overmyer sources was intended as compensation for both non-Chapter XI work and Chapter XI work, including work done for Telecasting.

## V. *Robson Firm Conflicts*

5.1 *Removal of the Operating Receiver.* On January 11, 1977, District Judge Dudley B. Bonsal entered an order removing Robert P. Herzog, Esquire, as operating receiver of DHO Co. and returning the debtor to possession. (Warehouse XI Docket, 1/18/77 Entry, Deft. Ex. 318, p. 2) Mr. Robson represented DHO Co., as debtor, not debtor-in-possession, in obtaining the order removing the operating receiver and restoring Mr. Overmyer to control of DHO Co. (Robson, 9 Tr. 902, 10 Tr. 1013; 11/11/86 Order to Show Cause to Remove Receiver and Restore Debtors to Possession, Deft. Ex. 183; *see* Robson, 13 Tr. 1398–99)

5.2 *The "Retention" of the Robson Firm as Special Counsel to DHO Co.* On June 6, 1977, a stipulation was filed in the Warehouse Chapter XI, substituting the Robson Firm for Ballon, Stoll & Itzler as special counsel to DHO Co. (6/6/77 Warehouse XI Stipulation Substituting the Robson Firm for Ballon Stoll, Deft. Exs. 96, 194; Robson, 11 Tr. 1042–43, 1046–50) Ballon, Stoll & Itzler, however, had never been retained as special counsel to DHO Co. (Robson, 11 Tr. 1026–27, 1045; Robson New York Fee Trial Testimony, 17 Tr. 1928–29, 1934, 1937–38, 1943–44; *see* 4/11/77 Warehouse XI Transcript of Hearing Re Accusations, Deft. Ex. 177, pp. 37–38, 43) The Robson Firm never filed a separate application for retention as DHO Co. special counsel. (Robson, 11 Tr. 1050; Robson New York Fee Trial Testimony, 17 Tr. 1951) The Robson Firm was therefore never properly retained as special counsel for DHO Co.

5.3 *Spectrum Development Company.* One of the matters that the operating receiver was questioning was the relationship between DHO Co. and Spectrum Development Company, Inc. (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 40, 44–48, 50, 51, 58, 61–64, 81, 84, 26 Tr. 3106, 3112–16, 3118, 3120, 3126, 3130–34, 3151–52, 3155) Spectrum was a company controlled by Mr. Overmyer through a holding company, Total Development Company, Inc. (Miller, 6 Tr. 596; Robson, 9 Tr. 906–09; Raible, 23 Tr. 2723; Robson New York Fee Trial Testimony, 17 Tr. 1969) Ninety percent of Total was owned by an Overmyer family trust, and Total, in turn, owned 80 percent of Spectrum. (5/12/80 Robson Letter to Bright, Deft. Ex. 190, p. 2; Robson New York Fee Trial Testimony, 17 Tr. 1970–71; *cf.* Robson, 9 Tr. 903–04) Prior to the filing of the Warehouse Chapter XI, Spectrum used approximately $26,000.00 of DHO Co. funds, plus borrowed funds, to construct a warehouse in New Jersey. (5/12/80 Robson Letter to Bright, Deft. Ex. 190, p. 3; 1973 DHO Co. Checks to Spectrum Totalling $26,000, Deft. Ex. 191, pp. 2–6; *see* Robson, 9 Tr. 903, 908–09) Spectrum leased the warehouse to DHO Co. for $125,000.00 per year. (6/28/77 Application to Cancel Spectrum Lease, para. 8, Deft. Ex. 186, third page) On March 1, 1977, after the removal of the operating receiver, DHO Co. leased the warehouse back to Spectrum for five years for $149,000.00 per year plus 50 percent of gross revenues in excess of $264,000.00 per year. (6/28/77 Application To Cancel Spectrum Lease, para. 10, Deft. Ex. 186, third page; 5/12/80 Robson Letter to Bright, Deft. Ex. 190, p. 3) As part of the refinancing of the warehouse, the Robson Firm filed an "Application" to terminate the master lease from Spectrum to DHO Co. in exchange for a payment of $25,000.00, barely more than

one year's base rent under the sublease. (6/28/77 Application to Cancel Spectrum Lease, Deft. Ex. 186, second through fifth pages; 5/12/80 Robson Letter to Bright, Deft. Ex. 190, p. 3; Robson, 9 Tr. 909) Mr. Overmyer subsequently sold his interest in Spectrum for $200,000.00. (Raible, 23 Tr. 2722-24; cf. Robson, 9 Tr. 910) When the DHO Co. sale of the Spectrum lease was investigated by the custodial receiver of DHO Co., Mr. Robson represented to the custodial receiver that Total was owned by a family trust over which Mr. Overmyer had no control. (Robson New York Fee Trial Testimony, 17 Tr. 1970; 5/12/80 Robson Letter to Bright, Deft. Ex. 190, p. 2) At the trial on the Robson Firm's fee application in the Warehouse Chapter XI in January, 1986, Mr. Robson admitted that "Dan Overmyer ran everything, even though it was owned by trusts that he had no control over. He operated as a consultant for all of these companies, and in that form, basically ran the daily operations." (Robson New York Fee Trial Testimony, 17 Tr. 1971) Mr. Robson admitted at the trial of this case that he represented both Spectrum and DHO Co., as well as Mr. Overmyer, in seeking bankruptcy court approval of Spectrum's purchase of the interest of DHO Co. in the New Jersey warehouse. (Robson, 9 Tr. 909-10; Robson Firm Spectrum Time Slips, Deft. Ex. 187) At the time of the "Application" to sell the interest of DHO Co. to Spectrum, both the Robson Firm and Ballon, Stoll & Itzler were receiving payments from Spectrum Development Company. (Robson, 9 Tr. 907-08; Miller, 6 Tr. 596; Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit A, Deft. Ex. 23, p. 8; Kaufman Dep., 16 Tr. 1705-06; Klein, 25 Tr. 2896) Neither in the Spectrum "Application" nor in any of his DHO Co. fee applications did Mr. Robson disclose to the New York Bankruptcy Court either the payments from Spectrum or his dual representation of Spectrum and DHO Co. (Robson New York Fee Trial Testimony, 17 Tr. 1954-59, 1974) Mr. Robson himself has characterized the conflict of interest involved in representing both DHO Co. and Spectrum as "inconceivable."

(Robson New York Fee Trial Testimony, 17 Tr. 1954-57)

5.4 *The Herzog Proof of Claim Against Telecasting.* On December 3, 1976, Mr. Herzog filed a $4,400,000.00 proof of claim on behalf of DHO Co. against Telecasting. (12/3/76 Herzog Proof of Claim, Deft. Ex. 181; Robson, 11 Tr. 1116; Robson New York Fee Trial Testimony, 17 Tr. 1884) One month after the proof of claim was filed, Mr. Herzog was removed as receiver. (Warehouse XI Docket, 1/18/77 Entry, Deft. Ex. 318, p. 2) For the next year and a half, the proof of claim languished. (*See* 4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 36-38, 26 Tr. 3101-03)

5.5 *The Adjudication of DHO Co.* On March 29, 1978, Mr. Robson filed a motion to recuse Judge Babitt. (Robson, 11 Tr. 1130-32; Ressler Dep., 25 Tr. 3015; 3/29/78 Notice of Motion for Recusation, paras. 7-8, Deft. Ex. 320, third page) At a hearing held on April 6, 1978, Edgar H. Booth, Esquire, counsel for the operating receiver, moved to adjudicate DHO Co. (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, p. 49, 26 Tr. 3117) The grounds alleged for adjudication were, *inter alia*, the Spectrum sellout (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 40, 44-48, 58, 26 Tr. 3106, 3112-16, 3126), the failure to prosecute the Herzog proof of claim (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 36-38, 26 Tr. 3101-03) and the fraudulent conveyarce of the Canadian warehouse companies to Mr. Overmyer (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 38-40, 26 Tr. 3103-05), a claim that FNBB later prosecuted successfully in this Court, *Hadar Decision*, 23 B.R. at 847-48, Finding 12.1. Judge Babitt allowed the motion to adjudicate on the ground that no plan could possibly be confirmed in the face of these serious charges. (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 78, 48, 52-53, 55, 59, 67-76, 81-83, 26 Tr. 3149, 3116, 3121, 3123-24, 3128, 3136-46, 3152-54; 4/7/78 Order of Adjudication and Appointment of Trustee, Deft. Ex. 321) He appointed former District Judge Harold R. Tyler, Jr., trustee pending appeal. (4/6/78 Warehouse XI Transcript,

Deft. Ex. 319, pp. 89–93, 26 Tr. 3161–65; 4/7/78 Order Granting Stay Pending Appeal, Deft. Ex. 322) At Mr. Robson's request, pending appeal, Judge Babitt left Mr. Overmyer in possession (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 91–92, 26 Tr. 3163–64) subject to the supervision of Mr. Tyler as custodial receiver (4/7/78 Order Granting Stay Pending Appeal, Deft. Ex. 322). Judge Babitt also denied the motion to recuse. (4/6/78 Warehouse XI Transcript, Deft. Ex. 319, pp. 96–97, 26 Tr. 3169; 4/6/78 Memo Endorsement, Deft. Ex. 320, sixth page) On May 23, 1978, District Judge Lloyd F. MacMahon affirmed Judge Babitt's order denying the motion to recuse, but vacated the order of adjudication on the ground of insufficient notice and lack of an adequate record and findings, and remanded for further proceedings before a different bankruptcy judge to be selected by lot. (5/23/78 Memorandum of Opinion, Deft. Ex. 323, pp. 2, 7–9) Mr. Tyler continued as custodial receiver. (5/23/78 Memorandum of Opinion, Deft. Ex. 323, p. 9; *see* 9/11/78 Order Delineating Responsibilities of Custodial Receiver, Deft. Ex. 324) The case was redrawn to Bankruptcy Judge Joel Lewittes. (Warehouse XI Docket, 7/21/78 Entry, Deft. Ex. 318, p. 4)

5.6 *The Guzzetta Retention.* One of the matters for which Ballon, Stoll & Itzler had been retained as special counsel for Telecasting encompassed the defense of the proof of claim filed by Mr. Herzog as operating receiver. (*See* 9/9/76 Ballon Stoll Retention "Petition," para. 5, Deft. Ex. 35, p. 2) After he assumed the position of special counsel to DHO Co. (*see* Finding 5.2, *supra* ), Mr. Robson also assumed the representation of DHO Co. in prosecuting the Herzog claim, and represented Telecasting in defending the claim. (Robson, 11 Tr. 1063–64, 1114–25; Miller, 4 Tr. 394–95) One of Mr. Tyler's first acts as custodial receiver was to object on May 4, 1978 to the serious conflict of interest involved in this dual representation. (Robson, 11 Tr. 1116–17; *see* Robson Firm Telecasting Time Slips, Robson 5/5/78 Entry, Deft. Ex. 40, p. 62) As a result, the Robson Firm withdrew from representing both Telecast-

ing and DHO Co., and secured the retention of John Guzzetta, Esquire, as special counsel to represent Telecasting. (Miller, 4 Tr. 394–95; Robson, 11 Tr. 1123, 1126–27; 5/22/78 Guzzetta Retention Application, Deft. Ex. 100) At the trial of this adversary proceeding, Mr. Robson claimed that his representation of both parties in a litigated matter between two Chapter XI debtors was a "technical problem" arising from the fact that "nobody treated these companies as separate entities." (Robson, 11 Tr. 1125) Mr. Robson explained his approach to representing both sides as follows: "since the companies were affiliated companies, and since they were both now under the control of the same people, it was my intention and understanding that Judge Babitt would be presented with both sides of the case with all the documentary evidence so that he could make a determination. I didn't consider it a dispute in the same sense that I would if an outside party had come in. The books were handled for both companies by the same people. The same witnesses would have had to testify for the warehouse company as would testify for Telecasting, since they were the ones who had made the entries.... I would have presented the court with all of the facts so that the court could make an independent determination." (Robson, 11 Tr. 1127–28) Mr. Robson's disregard of such an egregious conflict of interest is explained by the fact that his only real client was Daniel Harrison Overmyer. (*See* Robson Pro Haec Vice Testimony, 16 Tr. 1714–15)

5.7 *The Omega v. Grant and DHO Co. v. Talcott Settlement.* Mr. Robson represented DHO Co. in an action against James Talcott, Inc. (Robson, 13 Tr. 1312) Mr. Robson also represented Omega Executive Services, Inc., an Overmyer company in an action against the owners of Talcott, *Omega Executive Services, Inc. v. Grant.* (Robson, 13 Tr. 1309, 1313) The two cases were settled simultaneously. (Robson, 13 Tr. 1311; 12/1/80 $34,550.00 Omega v. Grant Settlement Check, Deft. Ex. 79, 12/1/80 $70,000.00 DHO Co. v. Talcott Settlement Check, Deft. Ex. 117) Mr. Robson received a contingent fee out of the *Omega*

*v. Grant* settlement, whereas his compensation for representing DHO Co. would be subject to allowance by the New York Bankruptcy Court whenever the Warehouse Chapter XI was over. (Robson, 13 Tr. 1309–14; Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit A, Deft. Ex. 23, p. 13; Robson Firm Schedule of Time Charges and Payments, Deft. Ex. 65, p. 10) He was unable to explain how the allocation of the settlement between Omega and DHO Co. was arrived at. (Robson, 13 Tr. 1311)

5.8 *Fidelity & Deposit.* On May 3, 1977, the United States Court of Appeals for the Second Circuit affirmed the District Court's refusal to enjoin the collection of a judgment entered in 1974 against Mr. and Mrs. Overmyer: "This appeal reveals a crass misuse of both the state and federal judicial systems to avoid the payment of a judgment." *Overmyer v. Fidelity & Deposit Co. of Maryland,* 554 F.2d 539, 540 (2d Cir.1977) (*Fidelity & Deposit Decision,* Deft. Ex. 42). Mr. Robson and Mr. Overmyer were not deterred; they found new ways to prolong the litigation. (*See* Robson, 10 Tr. 980–83) Mr. Robson immediately began efforts to take Bankruptcy Rule 205 examinations of Fidelity & Deposit in both the Telecasting Chapter XI and the Warehouse Chapter XI, even though Fidelity & Deposit was not a creditor in either case. (Miller, 4 Tr. 352–53, 355, 363–64; Robson, Miller & Osserman Supplemental Interrogatory Answers, Deft. Ex. 25, p. 2; *cf.* Robson, 10 Tr. 914–15) When this tactic failed, Mr. Overmyer asked Mr. Robson to file yet another motion to vacate the judgment on the ground of "fraud upon the court." (12/1/77 Connery Letter to Robson, Deft. Ex. 47) Work by the Robson Firm on the motion was charged to Telecasting. (Miller, 4 Tr. 381–82, 387–91; Robson, 9 Tr. 837; Robson, Miller & Osserman Supplemental Interrogatory Answers, Miller 12/6/77 Entry, Deft. Ex. 25, p. 4; Robson Firm Telecasting Time Slips, Deft. Ex. 40, p. 32; *cf.* Robson, 10 Tr. 929–30) The Robson Firm commenced a new civil action in the New York Supreme Court, which is a trial court in the New York judicial system, asking that the judgment be set aside, alleging that Mr. and Mrs. Overmyer had incurred $200,000.00 of counsel fees and expenses in contesting the $25,535.85 judgment and seeking judgment for $200,000.00 in compensatory damages, $600,000.00 in punitive damages and attorneys' fees. (12/16/77 Verified Complaint Against Fidelity & Deposit, paras. 18, 30, prayers a, b, c, d, Deft. Ex. 49, pp. 4–5, 6, 7–8; 12/16/77 Verification of Complaint Against Fidelity & Deposit, Deft. Ex. 50; 12/16/77 Summons to Fidelity & Deposit, Deft. Ex. 87; Robson, 10 Tr. 957, 965–71; Miller, 4 Tr. 379–82; *see* 12/15/77 Ressler Letter to Connery, Deft. Ex. 48) On January 23, 1978, Mr. and Mrs. Overmyer posted a $50,000.00 bond to stay the enforcement of the Fidelity & Deposit judgment. (1/23/78 Bond to Fidelity & Deposit, Deft. Ex. 88, *see* 1/24/78 Connery Letter to Uptegrove, Deft. Ex. 90; 1/23/78 $50,000.00 Hadar Certified Check to Fireman's Fund Insurance Co., Deft. Ex. 89) *See Hadar Decision,* 23 B.R. 879–80, Finding 24.1. On February 1, 1978, immediately after commencing the action, and knowing that there was "no legal procedure available" to modify the *Fidelity & Deposit Decision* of the Second Circuit, Mr. Robson drafted a letter for Mr. Overmyer to send to Judge Mulligan, who wrote the opinion, asking him to modify the language of that opinion criticizing Mr. Overmyer and his attorneys. (Miller, 4 Tr. 357, 370–71; 2/6/78 Overmyer letter to Judge Mulligan, Deft. Ex. 45; 2/1/78 Robson Draft of Overmyer Letter to Judge Mulligan, Deft. Ex. 44; *see* Robson, 9 Tr. 838–39) In contrast to the complaint that Mr. Robson had just served and Mr. Overmyer had sworn to be true, which alleged that Mr. and Mrs. Overmyer had "incurred the sum of $200,000.00 as and for counsel fees and other expenses" (12/16/77 Verified Complaint Against Fidelity & Deposit, para. 30, Deft. Ex. 49, p. 6; 12/16/77 Verification, Deft. Ex. 50), the letter stated that Mr. Overmyer had "probably spent more money trying to correct what I believe to be an injustice than it would have cost me to satisfy the [$25,000] judgment" (2/6/78 Overmyer Letter to Judge Mulligan, Deft. Ex. 45, p. 3; 2/1/78 Robson Draft of Overmyer Letter to Judge

Mulligan, Deft. Ex. 44, p. 5). After the Robson Firm lost the case in the New York Supreme Court, Mr. Connery wrote to the Robson Firm on May 19, 1978: "Dan still wants a rehearing *and* appeal. Please write Firemans Fund not to pay on bond as you are appealing." (5/19/78 Connery Memo to Ressler, Deft. Ex. 92 [emphasis in original]) Mr. Robson attempted to meet with Judge Mulligan to urge again the modification of the *Fidelity & Deposit Decision*, and, when he was unsuccessful, sent his own letter to Judge Mulligan on January 22, 1979, reciting facts that were not in the record, urging Judge Mulligan to modify the opinion and requesting a personal meeting, but not copying opposing counsel. (1/22/79 Robson Letter to Judge Mulligan, Deft. Ex. 46; Robson, 10 Tr. 918–20, 922–23, 924) After the Robson Firm lost the appeal to the Appellate Division, counsel for Fidelity & Deposit wrote to the Robson Firm requesting that Mr. and Mrs. Overmyer and Fireman's Fund Insurance Company honor their obligations on the bond. (5/16/79 Lambert Letter to Robson & Toboroff, Deft. Ex. 91) On May 22, 1979, Fidelity & Deposit made demand on Fireman's Fund Insurance Company to pay the judgment, and asserted that "[u]nless we hear from you within the next ten (10) days, we shall have no alternative but to refer this matter to our attorneys to institute the appropriate proceedings to seek to recover on the aforementioned bonds." (5/22/79 Shifman Letter to Fireman's Fund Insurance Company, Deft. Ex. 93, p. 2) On June 12, 1979, Mr. Connery wrote to Fireman's Fund Insurance Company stating that he was going to discuss with the Robson Firm the possibility of taking a "further appeal." (6/12/79 Connery Letter to Mastrocola, Deft. Ex. 95) At the same time, Mr. Connery sent a memo to the Robson Firm: "I am attempting to have the Internal Revenue Service attach the cash deposit behind the bond. Dan would like Easton & Echtman to bring an action on behalf of Shirley [Mrs. Overmyer] against Fidelity & Deposit for harassment and attach the bond. Is there anything further we can do to delay payment on this bond?" (6/12/79 Connery Memo to Ressler, Deft. Ex. 94)

The answer to this question will never be known: "The only recollection I have of Fidelity & Deposit is handling a supplementary proceeding for Mr. Overmyer and appearing or having some proceedings in the Bankruptcy Court with reference to a motion to quash. I don't remember anything else, and that's all I can tell you. I have no recollection of this case." (Robson, 10 Tr. 981) The delay tactics of the Robson Firm are reprehensible, quite aside from the fact that they were employed in the face of the admonition of the Second Circuit in the *Fidelity & Deposit Decision:* "It has not escaped our attention that appellants were assisted by counsel before both the district court and this court in bringing this sham suit and appeal.... The use of this court solely as a dilatory tactic to avoid paying a judgment is a serious breach of professional ethics. We remind the Bar that under Fed.R.Civ.P. 11 the signature of an attorney on a pleading 'constitutes a certificate by him ... that it is not interposed for delay.' We will not countenance attempts to pervert the federal judicial process into a Dickensian court where lawsuits never end." (*Fidelity & Deposit Decision,* 554 F.2d at 543 n. 4, Deft. Ex. 42 [citations omitted])

5.9 *LocaFrance.* Interstate Distribution Services, Inc. ("IDS"), a company controlled by Mr. Overmyer, leased space from DHO Co. at the Cincinnati and Toledo warehouses, in which it operated a public warehousing business. (Robson, 14 Tr. 1474–75, 1503; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 64; 10/21/80 LocaFrance Ohio Common Pleas Decision, Deft. Ex. 137, p. 1) Mr. Robson undertook to represent IDS in an adversary proceeding brought against it by Mr. Herzog as operating receiver of DHO Co. (12/10/76 Stipulation Substituting Ballon Stoll for Alex Rosen as IDS Counsel, Deft. Ex. 185; 11/19/76 Adams Retainer Letter to Robson, Deft. Ex. 182) After Mr. Herzog was removed as receiver (*see* Finding 5.1, *supra*) and Mr. Robson usurped the position of special counsel to DHO Co. (*see* Finding 5.2, *supra*), Mr. Robson undertook to represent both parties to the litigation. (Robson New York Fee Trial

Testimony, 17 Tr. 1954–56) Mr. Robson never disclosed to the New York Bankruptcy Court either the dual representation or his receipt of compensation from IDS. (Robson New York Fee Trial Testimony, 17 Tr. 1950–51, 1957–59) The conflict was brought to the attention of Judge Babitt on April 11, 1977 (4/11/77 Warehouse XI Transcript of Hearing Re Accusations, Deft. Ex. 177, pp. 37–38), with the result that he ordered Mr. Robson in no uncertain terms to cease his dual representation (4/11/77 Warehouse XI Transcript of Hearing Re Accusations, Deft. Ex. 177, pp. 41–43). "This is a most [e]gregious conflict, most outrageous imposition." (4/11/77 Warehouse XI Transcript of Hearing Re Accusations, Deft. Ex. 177, p. 42) Interstate defaulted on $180,919.00 of rent due to DHO Co. (8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 65) LocaFrance United States Corporation obtained judgments against IDS of $9,922.34 and $30,267.12. (10/21/80 LocaFrance Ohio Common Pleas Decision, Deft. Ex. 137, p. 1; see Robson, 14 Tr. 1476–77) When LocaFrance sought to garnish the accounts receivable of IDS to satisfy these judgments, Mr. Overmyer transferred all the accounts and business of IDS to two newly formed Overmyer companies, MidAmerican Warehouse Company and Express Warehouse and Distribution Company. (10/21/80 LocaFrance Ohio Common Pleas Decision, Deft. Ex. 137, pp. 1–2; see Robson, 14 Tr. 1477–79) LocaFrance then sued Mid-American and Express, as well as IDS, seeking to follow the fraudulently conveyed accounts and to recover punitive damages and attorneys fees for the fraudulent conveyance. (10/21/80 LocaFrance Ohio Common Pleas Decision, Deft. Ex. 137) Trial was scheduled for March 3, 1980. (2/26/80 Robson Letter to Royer, Deft. Ex. 141) On February 22, 1980, Mr. Robson, as "special counsel" for DHO Co., was asked to comment on security agreements held by DHO Co. in the accounts receivable of Mid-American and Express. (2/22/80 Connery Letter to Robson, Deft. Ex. 142) On February 26, 1980, without disclosure to the New York Bankruptcy Court, Mr. Robson undertook to assist in representing Mid-American

and Express in the defense of the LocaFrance action. (2/26/80 Robson Letter to Royer, Deft. Ex. 141; Robson, 14 Tr. 1503, 1504, 1513–14; Robson New York Fee Trial Testimony, 17 Tr. 1978–79) On February 29, 1980, the Robson Firm obtained an *ex parte* order from the New York Bankruptcy Court that permitted DHO Co. to conduct a public warehousing business in the premises leased to Mid-American. (Robson, 14 Tr. 1505; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 65; 2/28/80 Robson Firm Time Slip, Deft. Ex. 139; 2/29/80 Robson Firm Time Slip, Deft. Ex. 140) In March, 1980, DHO Co. terminated the lease to Mid-American. (8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 65) Mid-American owed DHO Co. $163,-625.00 in unpaid rent at the time the lease was terminated. (Robson, 14 Tr. 1486–87; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 65) On October 21, 1980, the Lucas County Court of Common Pleas entered judgment in favor of LocaFrance against IDS, Mid-American and Express for $60,000.00 in punitive damages and $22,865.75 in attorneys fees (in addition to the underlying $40,000.00 of judgments) for the deliberate fraudulent conveyance from IDS to Mid-American and Express. (10/21/80 LocaFrance Ohio Common Pleas Decision, Deft. Ex. 137, p. 6; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 66; see Robson 14 Tr. 1528–29) When LocaFrance learned that the warehouse operations had been fraudulently conveyed to DHO Co., LocaFrance moved in the Lucas County Court of Common Pleas to garnish the accounts that were now in the possession of DHO Co. (Robson, 14 Tr. 1530; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 66) Mr. Robson then commenced an adversary proceeding by DHO Co. against LocaFrance in the New York Bankruptcy Court, seeking to enjoin the garnishment on the basis of an alleged violation of the DHO Co. automatic stay, even though the LocaFrance action against DHO Co. was clearly a post-petition cause of action. (Robson, 14 Tr. 1530; 8/4/82 Robson & Miller Interim DHO Co.

Fee Application, Deft. Ex. 138, p. 67) *See* 28 U.S.C. § 959(a). LocaFrance was forced to go to New York to defend this unwarranted adversary proceeding. (Robson, 14 Tr. 1530–31) On July 2, 1981, the New York Bankruptcy Court declined to exercise jurisdiction and directed that DHO Co. proceed with the litigation in Ohio. (Robson, 14 Tr. 1531; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, pp. 67–68; 7/2/81 Lewittes Memorandum Endorsed, Deft. Ex. 192) Bankruptcy Judge Lewittes and District Judge Sweet each denied a stay pending appeal. (8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, pp. 68–69) The Robson Firm then undertook to defend DHO Co. in the action in the Lucas County Court of Common Pleas. (Robson, 14 Tr. 1532) On August 13, 1981, garnishment orders were entered against DHO Co. in the Court of Common Pleas, allowing the collection of the $60,000.00 in punitive damages and the $22,865.75 in attorneys fees. (Robson, 14 Tr. 1532; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, pp. 69–70) Mr. Robson again sought a stay pending the appeal of Judge Lewittes's decision, and on August 24, 1980, District Judge Owen denied a stay. (Robson New York Fee Trial Testimony, 17 Tr. 1984; 8/24/81 Owen Endorsement Memorandum, Deft. Ex. 193; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, pp. 70–71) Funds of DHO Co were used to collateralize an appeal bond. (Robson, 14 Tr. 1533; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 71) On June 25, 1982, the Ohio Court of Appeals affirmed the judgment as to punitive damages and attorneys fees, and added an additional 10 percent penalty to the underlying judgment for taking a frivolous appeal. (6/25/82 LocaFrance Ohio Court of Appeals Decision, Deft. Ex. 75, pp. 5–6; Robson, 14 Tr. 1533–34; Robson New York Fee Trial Testimony, 17 Tr. 1991–92; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 71) LocaFrance collected approximately $100,000.00 on the judgment out of the assets of DHO Co. (Robson, 14 Tr. 1534–35; Robson New York Fee Trial Testimony, 17 Tr. 1979) DHO Co. lost approximately $485,000.00 in its dealings with Mr. Overmyer's three companies—$180,919.00 in unpaid rent by IDS, $163,625.00 in unpaid rent by MidAmerican, the $40,000.00 underlying LocaFrance judgments and $100,000.00 in punitive damages, attorneys fees, penalty and interest. (Robson, 14 Tr. 1533–39) Mr. Robson, in his usurped capacity as DHO Co. special counsel, took no steps to recoup the DHO Co. losses either from IDS, MidAmerican and Express or from Mr. Overmyer (Robson, 14 Tr. 1487), despite the fact that he was holding $250,000.00 of purported Overmyer funds in the Robson Trust (*see* Finding 9.8, *infra*). Instead, he applied to the DHO Co. estate for compensation for 333.9 hours of work on the LocaFrance case. (Robson, 14 Tr. 1542–43; 8/4/82 Robson & Miller Interim DHO Co. Fee Application, Deft. Ex. 138, p. 72)

5.10 *Concealment of the Robson Firm's Conflicts.* The extent of the Robson Firm's conflicts remained concealed until 1986, because the Robson Firm refused to disclose its time records at a 1982 fee hearing in the Warehouse Chapter XI and Bankruptcy Judge Lewittes refused to permit discovery or hold an evidentiary hearing. (*See* Robson, 14 Tr. 1542–45) Telecasting appealed Judge Lewittes's decision and secured its reversal by the United States Court of Appeals for the Second Circuit. (10/24/83 Unreported Second Circuit Decision, Deft. Ex. 143) As a result, discovery was conducted, a full evidentiary hearing was held, the conflicts began to come to light and the Robson Firm was forced to agree to pay back the entire $627,500.00 that it had already received in fees and disbursements. (Robson, 14 Tr. 1545–47; 5/22/87 Fee Order, Deft. Ex. 317, pp. 6–14; Robson New York Fee Trial Testimony, 17 Tr. 1938–74)

## VI. *The General Electric Settlement Malpractice*

6.1 *The General Electric Lawsuits.* Intermodal Systems Leasing, Inc. ("ISLI"), an Overmyer-controlled leasing company (Robson Pro Haec Vice Testimony, 16 Tr. 1714–15), purchased equipment from Gen-

eral Electric Company in May, 1969. (Robson, 21 Tr. 2536–37) ISLI leased the equipment to Telecasting. (Robson, 21 Tr. 2537) For many years, Telecasting paid the rent to ISLI. (Robson, 21 Tr. 2537) ISLI failed to pay General Electric approximately $150,000.00 out of the $350,000.00 due for the purchase of equipment. (Robson, 21 Tr. 2537) General Electric sued ISLI for the balance due. (Robson, 21 Tr. 2540) ISLI transferred the equipment and the Telecasting lease to D.H. Overmyer Trucking Co., Inc. (which later changed its name to Hadar Leasing International Company, Inc.) by a backdated agreement "made as of December 8, 1975," but actually executed in late August or early September, 1976. (Robson, 21 Tr. 2537–38, 2539; Raible, 23 Tr. 2731–33; Klein, 25 Tr. 2912; "12/8/75" ISLI–Hadar Agreement, Deft. Ex. 277, pp. 2–5) The General Electric equipment was included in a Hadar lease for $16,067.37 plus sales tax per month. (10/18/78 Raible Memorandum to Robson, Deft. Ex. 267; Raible, 23 Tr. 2731–32) Telecasting paid the rent due to Hadar. (Robson, 21 Tr. 2539; Raible, 23 Tr. 2759–62) Mr. Robson delivered to Telecasting a legal opinion that it could enter into leases with Hadar without the approval of the New York Bankruptcy Court. (Robson, 13 Tr. 1389–90, 21 Tr. 2539–40; 4/3/78 Robson Opinion Letter to Telecasting, Deft. Ex. 133) The General Electric lawsuit against ISLI was defended by another law firm. (Robson, 21 Tr. 2540) On September 14, 1978, judgment was entered against ISLI in favor of General Electric in the amount of $209,981.97. (Robson, 21 Tr. 2540–41; General Electric Settlement Agreement, p. 2, Deft. Ex. 266, p. 5) General Electric then commenced an adversary proceeding against Telecasting in the New York Bankruptcy Court to reclaim the equipment and to recover possession of it. (Robson, 21 Tr. 2541) The Robson Firm defended Telecasting in the adversary proceeding. (Robson, 21 Tr. 2541, 22 Tr. 2602–03)

6.2 *The Settlement.* Although Mr. Ressler did most of the work on the General Electric adversary proceeding (Time Summary for General Electric Settlement, Deft. Ex. 268), Mr. Robson personally negotiated the settlement (1/30/79 Leibowitz Letter to Robson, Deft. Ex. 280; 1/30/79 Leibowitz Letter to Robson with Robson Representation of Authority To Settle, Deft. Ex. 281; 4/16/79 Robson Letter to Leibowitz, Deft. Ex. 275; 5/4/79 Leibowitz Letter to Robson, Deft. Ex. 282; Ressler Dep., 30 Tr. 3007–08; *cf.* Robson, 21 Tr. 2543, attempting to blame Mr. Ressler and Mr. Connery). From the outset, it was proposed that in settlement of the litigation Telecasting would pay General Electric the sum of $150,000.00, with $30,000.00 down and $120,000.00 payable in monthly installments, with interest over a three-year period. (*Compare* 1/30/79 Leibowitz Letter to Robson, para. 1, Deft. Ex. 280, p. 1, *with* General Electric Settlement Agreement, para. 1, p. 3, Deft. Ex. 266, p. 6) Mr. Robson admitted that he was aware that it would be better for Telecasting to acquire title to the equipment than to leave title with Hadar. (Robson, 22 Tr. 2603) Mr. Leibowitz, the attorney for General Electric, initially proposed a settlement that included a provision that General Electric would obtain a security interest by means of a transfer of title to the equipment to General Electric and a three-year financing lease from General Electric to Telecasting "at the end of which [Telecasting] may purchase the said property for a nominal sum." (1/30/79 Leibowitz Letter to Robson, para. 2, Deft. Ex. 280, p. 1; Robson, 22 Tr. 2655–57) Mr. Robson understood that this term would have given Telecasting title to the equipment at the end of the three-year payout period for a payment of $2.00, $5.00 or $10.00. (Robson 22 Tr. 2602, 2657) Nonetheless, Mr. Robson negotiated this provision out of the settlement. (Robson, 22 Tr. 2673–74, 2675–76; 5/4/79 Leibowitz Letter to Robson, para. 3, Deft. Ex. 282, p. 1) Mr. Robson first proposed to Mr. Leibowitz that ISLI transfer its interest in the equipment to Telecasting, that Telecasting grant General Electric a security interest in the equipment and that Telecasting and ISLI jointly agree to defend the General Electric security interest. (4/16/79 Robson Letter to Leibowitz, Deft. Ex. 275; Robson, 22 Tr. 2605–06) This proposal was an attempt to defraud General

Electric; Mr. Robson knew that ISLI had no interest in the equipment. (Robson, 22 Tr. 2605–09; 12/13/78 Connery Letter to Ressler, para. 1, Deft. Ex. 276; "12/8/75" ISLI–Hadar Agreement, Deft. Ex. 277, pp. 2–5) The equipment had been transferred to Hadar three years earlier. (Robson, 21 Tr. 2537–38, 2539; "12/8/75" ISLI–Hadar Agreement, Deft. Ex. 277, pp. 2–5) Mr. Robson knew not only that ISLI did not have title to the equipment, but also that ISLI had no assets at all. (Robson, 13 Tr. 1409, 22 Tr. 2608–09) Further negotiations by Mr. Robson (Robson, 21 Tr. 2544) produced a final settlement agreement pursuant to which Telecasting paid the settlement amount, but Hadar retained title to the equipment and Hadar and ISLI granted security interests to General Electric. (General Electric Settlement and General Electric Security Agreement, Deft. Ex. 266, pp. 4–7, 11–23; *cf.* Robson, 21 Tr. 2544–46) The settlement was modified in this manner to the benefit of Hadar, even though Mr. Robson did not know whether Hadar was even represented in the settlement negotiations. (Robson, 22 Tr. 2603) The manner in which Mr. Robson changed the terms of the General Electric settlement enabled Hadar to charge Telecasting rent on the General Electric equipment at the same time that Telecasting was paying General Electric the remainder of the purchase price. (Klein, 25 Tr. 2909–10; Robson, 21 Tr. 2547–48) If General Electric had taken title to the equipment, Hadar could not have charged Telecasting rent on the equipment. Mr. Robson has already fully litigated—and lost—his contention that the sole impropriety in the General Electric settlement was Hadar's failure to give Telecasting bookkeeping credits for its payments to General Electric. (Robson Bankruptcy Court Pro Haec Vice Post-Hearing Memorandum, pp. 12–14, Deft. Ex. 127; Robson District Court Pro Haec Vice Appellants' Brief, pp. 13–16, Deft. Ex. 128; Robson District Court Pro Haec Vice Appellants' Reply Brief, pp. 11–15, Deft. Ex. 129; Robson Court of Appeals Pro Haec Vice Appellant's Brief, pp. 25–29, Deft. Ex. 131, Robson Court of Appeals Pro Haec Vice Appellant's Reply Brief, pp. 2–4, Deft. Ex. 132;

Pro Haec Vice Decision, *Hadar Leasing International Co. v. D.H. Overmyer Telecasting Co. (In re D.H. Overmyer Telecasting Co.)*, 29 B.R. 647, 651 (Bankr.N.D. Ohio 1983), aff'd, Case No. C83–2248, Slip Opinion p. 4 (N.D.Ohio Sept. 23, 1983), *aff'd*, 750 F.2d 31, 33 (6th Cir.1984), Deft. Exs. 113, 112, 114)

6.3 *The Malpractice.* Mr. Robson's negotiation of the General Electric settlement, and, in particular, his elimination from the settlement of General Electric's proposal that Telecasting receive title, is a very clear instance of malpractice (Roberts, 24 Tr. 2859–69; Miller, 9 Tr. 790–92, 808) and a violation of Disciplinary Rules 6–101 and 7–101 of the Code of Professional Responsibility (Roberts, 24 Tr. 2869–74).

6.4. *Telecasting's Damages.* Telecasting paid $141,674.26 to or for the benefit of General Electric (Klein, 25 Tr. 2948), consisting of (a) $30,000.00 as a down payment on the settlement (Klein, 25 Tr. 2909–10, 2936–39), (b) $76,822.36, consisting of 19 monthly payments of $4,043.28 to General Electric (Klein, 25 Tr. 2909), (c) $4,851.94 to United States Trust Company, consisting of one $4,043.28 payment to General Electric made by United States Trust Company and not reimbursed by Telecasting plus the 20 percent premium paid to United States Trust Company under Telecasting's plan of reorganization (Klein, 25 Tr. 2910–11), and (d) $30,000.00 paid to General Electric by Telecasting to settle its remaining claim (Klein, 25 Tr. 2911). (Klein General Electric Damages Summary, Deft. Ex. 289) At the same time, Telecasting made 19 monthly payments of $8,956.50 to Hadar, a total of $170,173.50. (Klein, 25 Tr. 2907–08; Klein General Electric Damages Summary, Deft. Ex. 289) Under the leasing policy of ISLI, ISLI leases to Telecasting included renewal and purchase options. (Klein, 25 Tr. 2913) If Mr. Robson had enforced the renewal and purchase option terms of the ISLI lease of the General Electric equipment to his client, Telecasting, Telecasting would have paid to ISLI only $14,253.69 in rent from June 15, 1979 through the termination of the ISLI lease in March, 1982. (Klein, 25 Tr. 2912–13; Klein General Elec-

tric Damages Summary, Deft. Ex. 289) In addition, at that time Telecasting could have acquired title to the equipment for an additional $1.00 payment to ISLI. (Klein, 25 Tr. 2913) Telecasting's damages are the amount it actually paid to or for the benefit of General Electric ($141,674.26) plus the amount it actually paid to Hadar ($170,173.50) minus the amount of rent it should have paid to ISLI ($14,253.69), or a total of $297,594.07. (Klein, 25 Tr. 2914; Klein General Electric Damages Summary, Deft. Ex. 289)

### VII. *The Breakup of Robson & Toboroff*

7.1 *The "Firing" of Howard Ressler.* Mr. Ressler left Robson & Toboroff primarily because of his dissatisfaction with the Overmyer cases. (Ressler Dep., 25 Tr. 3010; *cf.* Robson, 9 Tr. 883) Mr. Ressler's dissatisfaction arose from one case in particular. (Ressler Dep., 25 Tr. 3010) That case was an adversary proceeding brought by a real estate broker to collect a $100,000.00 commission on the sale of the DHO Co. Cincinnati warehouse that was owned in fee by DHO Co. (Ressler Dep., 25 Tr. 3010–12; Robson & Toboroff Final DHO Co. Fee Application, Deft. Ex. 316, pp. 27–28) At a pre-trial conference that Mr. Ressler attended, Bankruptcy Judge Lewittes expressed his view that there appeared to be very little merit to the Consolidated Debtors' legal position, and indicated that if the Consolidated Debtors proceeded with the case and forced witnesses to fly in from around the country, it was his intention to award costs against the Consolidated Debtors. (Ressler Dep., 25 Tr. 3012) Mr. Ressler reported Judge Lewittes's remarks to Mr. Robson. (Ressler Dep., 25 Tr. 3013) After speaking with Mr. Overmyer, Mr. Robson told Mr. Ressler to go ahead and try the case. (Ressler Dep., 25 Tr. 3013) Mr. Ressler told Mr. Robson that he would not do so. (Ressler Dep., 25 Tr. 3013) Mr. Robson told Mr. Ressler "[Y]ou're fired." (Ressler Dep., 25 Tr. 3013) Mr. Ressler responded: "I'm a partner in the firm.... [Y]ou can't fire me." (Ressler Dep., 25 Tr. 3013) Mr. Robson then "said he wanted my resignation on his desk at 9:00 o'clock the next morning." (Ressler Dep., 25 Tr. 3013) Mr. Robson tried the case the next day. (Robson, 25 Tr. 3013, 3014) The relief sought by the brokers was granted, costs were assessed against the Consolidated Debtors and the court raised with the custodial receiver of DHO Co. the question whether costs should be assessed against the Robson Firm. (Ressler Dep., 25 Tr. 3015; Robson & Toboroff Final DHO Co. Fee Application, Deft. Ex. 316, p. 28) Mr. Robson made the decision that the Robson Firm would go forward and try the case. (Ressler Dep., 25 Tr. 3014)

7.2 *The Breakup of the Firm.* Mr. Ressler and Mr. Toboroff left Robson & Toboroff in the summer of 1979. (Robson, 9 Tr. 883; Miller, 3 Tr. 292) Mr. Robson and Mr. Miller formed the firm of Robson & Miller in July or August, 1979. (Miller, 3 Tr. 292) Mr. Robson and Mr. Miller claim that Robson & Miller is a separate firm from Robson & Toboroff (Robson, 9 Tr. 883; Miller, 3 Tr. 292), but this claim is inconsistent with the fact that Robson & Miller was never substituted for Robson & Toboroff, or separately retained as special counsel to Telecasting (*cf.* Telecasting Chapter XI Docket, July 1979 and Following Entries, Deft. Ex. 53). Robson & Miller is a successor to Robson & Toboroff, not a separate firm. (Connery Hadar Adversary Proceeding Testimony, 28 Tr. 3465)

7.3 *Subsequent History of Robson & Miller.* On January 1, 1983, Robson & Miller changed its name to Robson, Miller & Osserman to reflect the admission of Richard A. Osserman, Esquire, as a partner. (Robson, 9 Tr. 899; Miller, 3 Tr. 296) In 1985, Mr. Osserman left the firm to go into private business ventures, and the name of the firm was changed back to Robson & Miller. (Miller, 3 Tr. 296–97) In March, 1986, Mr. Robson and Mr. Miller became contract partners of the firm of Cooper, Cohen, Singer, Ecker & Shainswit. (Miller, 3 Tr. 297) That arrangement lasted only until November, 1986, when Mr. Robson and Mr. Miller reverted to using the name Robson & Miller. (Miller, 3 Tr. 297–98)

## VIII. *The Motion To Dismiss the Telecasting Chapter XI*

8.1 *The Motion To Dismiss.* On September 2, 1976, FNBB moved to dismiss the Telecasting Chapter XI in the Southern District of New York on the ground that Telecasting was not insolvent, Bankruptcy Act § 323, former 11 U.S.C. § 723, and, at the same time, moved for relief from the TOC automatic stay to permit FNBB to sell the stock of Telecasting that was owned by TOC and pledged to FNBB as security for a loan. (Robson, 11 Tr. 1075, 1077–92; Telecasting Chapter XI Docket, Entry 6, Deft. Ex. 53, p. 2) *Hadar Decision*, 23 B.R. at 893–94, Finding 30. Judge Babitt allowed both FNBB motions, but Judge Lewittes granted rehearing. (Robson, 11 Tr. 1077–78; Miller, 5 Tr. 485) On rehearing in 1980, Judge Lewittes reaffirmed Judge Babitt's rulings allowing the motions. (Robson, 11 Tr. 1078; Miller, 5 Tr. 485) Mr. Robson knew that Mr. Overmyer was ready to file a new Chapter 11 case for Telecasting in the Northern District of Ohio, if the order dismissing the Telecasting Chapter XI was affirmed. (Robson, 12 Tr. 1155–57, 1160–61; 10/27/80 Connery Memo to Robson, Deft. Ex. 104; 10/29/80 Connery Memo to Robson, Deft. Ex. 105) Nevertheless, Mr. Robson appealed Judge Lewittes's orders and sought a stay pending appeal. (Robson, 11 Tr. 1082–83, 12 Tr. 1200–03; Robson Stay Memorandum, Deft. Ex. 108, pp. 7–8) Judge Lewittes stayed his orders pending appeal on condition that TOC pay interest to FNBB and that Telecasting provide monthly financial reports to FNBB. (Robson, 11 Tr. 1079, 1081–82) For a period of time, TOC made the required interest payments by using the funds of Telecasting. (Robson, 11 Tr. 1082; *see* Robson, 11 Tr. 1079–81) On appeal, Judge Gagliardi affirmed Judge Lewittes's orders, but again granted a stay pending appeal on the same conditions. (Robson, 11 Tr. 1082–83; Miller, 5 Tr. 489) Mr. Robson took a further appeal to the United States Court of Appeals for the Second Circuit. (Robson, 11 Tr. 1083–84) Eventually, Mr. Overmyer violated the conditions of the stay by failing to make the required interest payments and failing to furnish the required financial reports. (Robson, 11 Tr. 1083) On February 6, 1981, Mr. Overmyer voluntarily withdrew the appeal to the Second Circuit, thereby causing the order dismissing the Telecasting Chapter XI to become final. (Robson, 11 Tr. 1083–84) On the same day, Mr. Overmyer filed the Telecasting Chapter 11 in this court. (Robson, 11 Tr. 1084; Telecasting Chapter 11 Docket, 2/6/81 Entry, Deft. Ex. 54, p. 1)

8.2 *Citicom's Attempt To Purchase Telecasting.* During the time that Mr. Robson was working on the motion to dismiss the Telecasting Chapter XI, a company in which he owned a 17½ percent interest, Citicom Broadcasting Company, was attempting to purchase the assets of Telecasting. (Robson, 11 Tr. 1098, 12 Tr. 1204–05, 1215–17; *see* 1/6/81 Telecasting XI Transcript, Deft. Ex. 109, pp. 19–21, 31–33; 1/15/81 TOC XI Transcript, Deft. Ex. 97, p. 4; 1/20/81 TOC XI Transcript, pp. 5–6) In addition, during the Telecasting Chapter 11, Citicom filed a competing application with the FCC for Telecasting's broadcast license, without disclosing to the FCC that Mr. Miller held a 25 percent beneficial interest in Mr. Robson's ownership interest in Citicom. (Robson, 13 Tr. 1361–62, 1364; Miller, 6 Tr. 576–77, 581–85; 7/30/82 Citicom Competing FCC Application, Deft. Ex. 60)

## IX. *The Weathervane Fraud*

9.1 *The Ouster of Daniel Harrison Overmyer from Control of Telecasting.* On March 25, 1981, less than two months after Mr. Overmyer filed the Telecasting Chapter 11, this Court entered orders that permitted FNBB to vote the stock of Telecasting which was pledged to FNBB, to install new management for the debtor-in-possession, and to oust Mr. Overmyer from possession and control of Telecasting's assets. (Telecasting 11 Docket, Entry 50, Deft. Ex. 54; 3/25/81 Stock Vote Order, Deft. Ex. 311; 3/25/81 Director Recognition Order, Deft. Ex. 312) Two days later, on March 27, 1981, Mr. Overmyer filed a Chapter 11 case for Hadar in the Southern District of New York. (Hadar New York Docket, 3/27/81 Entry, Deft. Ex. 308) On July 22, 1981,

pursuant to the motion of Telecasting and over the continual opposition of Mr. Overmyer, the Hadar Chapter 11 was transferred to the Northern District of Ohio. (Hadar New York Docket, Deft. Ex. 308; Hadar Cleveland Docket, first Entry, Deft. Ex. 309)

9.2 *Mr. Overmyer's Decision To Sell the Weathervane Assets.* Weathervane owned the estate of Mabel M. Gabriel, a 264–acre estate in Westchester County, New York, consisting of about 180 acres in the Town of Newcastle, plus two separate contiguous parcels in the adjoining Town of Yorktown, improved by a mansion house and various appurtenant farm buildings. (Albert, 20 Tr. 2265, 2307; Mitchell, 1 Tr. 77–79, 89; *see* 3/19/82 Weathervane Deed, Deft. Ex. 20; 4/15/82 Weathervane Deed, Deft. Ex. 22) In 1978, Mr. Overmyer's "consultants," Mr. Helmke and Mr. Strang, had consulted with Jacques A. Mitchell, III, of A.T. Houlihan, Inc., a real estate brokerage firm in Westchester County. (Mitchell, 1 Tr. 74) As a result, Mr. Overmyer had retained Harold Campbell, a local surveyor who knew the property, to prepare a topographical map and sketch plan of the Newcastle portion of the Lady Gabriel estate, showing the feasibility of dividing the property into 49 building lots, the maximum number that can be developed without constructing a public sewerage system. (Mitchell, 1 Tr. 77, 82–83; Campbell 1978 Sketch Plan, Deft. Ex. 2) Immediately after he lost control of Telecasting in March, 1981, Mr. Overmyer commenced efforts to sell the Lady Gabriel estate. (*See* Mitchell, 1 Tr. 73–74) During this period, the Westchester real estate market was extremely depressed. (Albert, 20 Tr. 2270–72; Lasberg, 20 Tr. 2229) In April, 1981, Mrs. Overmyer gave Mr. Mitchell the Campbell sketch and asked him what the property was worth. (Mitchell, 1 Tr. 80–81) Mr. Mitchell gave Mrs. Overmyer a superficial view based on the Campbell sketch that the Lady Gabriel estate should sell for about $1,000,000.00 on the basis of dividing it into 49 building lots. (Mitchell, 1 Tr. 82–83; 4/22/81 Mitchell Letter to Mrs. Overmyer, Deft. Ex. 3) Mr. Mitchell explained to Mrs. Overmyer that, in order to obtain the best

price for the property, it would have to be sold to a developer "subject to" obtaining appropriate subdivision approval rather than on an immediate all cash basis. (Mitchell, 1 Tr. 81–82; 4/22/81 Mitchell Letter to Mrs. Overmyer, Deft. Ex. 3) He also told her that the Campbell sketch was not a sensible plan of development, and he suggested a different division of the property. (Mitchell, 1 Tr. 83–84) As a result, Mr. Overmyer retained Mr. Campbell to prepare a new sketch plan based on dividing the property into two parcels, one containing the mansion house and appurtenances and the other large enough to accommodate 49 building lots. (Mitchell, 1 Tr. 84–85, 87; 5/8/81 Overmyer Letter to Campbell, Deft. Ex. 5) In May, 1981, Mr. Overmyer retained Eugene Albert of The Albert Appraisal Company, Inc. to appraise the Lady Gabriel estate. (Albert, 20 Tr. 2265–66, 2273, 2300) Mr. Albert appraised the property for $2,075,000.00, or approximately $11,525.00 per acre. (Albert, 20 Tr. 2280; 5/27/81 Albert Appraisal, Pl. Ex. A) Mr. Overmyer refused to pay to The Albert Appraisal Company the balance due for the appraisal, because he was disappointed that the value was as low as it was and thought that it should have been higher. (Albert, 20 Tr. 2315–16) He even attempted, unsuccessfully, to convince Mr. Albert to increase his appraisal. (Albert, 20 Tr. 2316) During the summer and fall of 1981, Mr. Overmyer listed the Lady Gabriel estate with A.T. Houlihan, Inc., and Mr. Campbell and Mr. Mitchell worked together on a new sketch plan based on Mr. Mitchell's advice that the raw development land should be divided from the mansion parcel. (Mitchell, 1 Tr. 88–90) Mr. Campbell prepared a sketch plan and a subdivision map dividing the Lady Gabriel estate into a 61–acre parcel containing the mansion and appurtenances and a 117–acre parcel of raw land for development. (Mitchell, 1 Tr. 89–90; Campbell Revised Sketch Plan, Deft. Ex. 6; Campbell Survey, Deft. Ex. 7) Mr. Mitchell also made a systematic analysis of how the Lady Gabriel property should be marketed to maximize the selling price. (Mitchell, 1 Tr. 91) Mr. Mitchell consulted with David Portman, the president of a planning firm

and a consultant to the Newcastle Planning Board. (Mitchell, 1 Tr. 91–92) As a result, Mr. Mitchell concluded that under the Multi-Family Planned Development ("MFPD") ordinance of the Town of Newcastle, the 117–acre parcel could be subdivided into a minimum of 157 two-bedroom units and a maximum of 178 two-bedroom units. (Mitchell, 1 Tr. 93–94) The Lady Gabriel estate was one of only three or four properties in the Town of Newcastle that were large enough to qualify for development under the MFPD ordinance. (Albert, 20 Tr. 2269–70; Lasberg, 20 Tr. 2247–48) At this point in time, Mr. Overmyer was insisting to Mr. Mitchell that he wanted $20,000.00 per acre for the property, which would be $2,340,000.00 for the 117–acre development parcel alone. (Mitchell, 1 Tr. 96) Mr. Mitchell repeatedly advised Mr. Overmyer that the only way to obtain such a price was to sell the property to a developer "subject to" obtaining necessary subdivision approval. (Mitchell, 1 Tr. 95–96; *see* Albert, 20 Tr. 2281–84; Lasberg, 20 Tr. 2225–26, 2237–38, 2239) Because developers think in terms of units rather than acres, Mr. Mitchell had to translate Mr. Overmyer's price into a per-unit price in order to interest developers in purchasing the property. (*See* 1/29/82 Mitchell Letter to Schamberg, Deft. Ex. 9, p. 1) Mr. Mitchell contacted the three leading developers in Newcastle. (Mitchell, 1 Tr. 96–97) Two were not interested, but the third, Ellis M. Lasberg, was. (Mitchell, 1 Tr. 97–98) Mr. Lasberg lined up two very substantial individuals, either one of whom was capable of attracting the necessary bank financing and assembling a financially solid investor group. (Lasberg, 20 Tr. 2223–25; Mitchell, 1 Tr. 98) Mr. Lasberg offered to pay $12,500.00 per unit, a total of $2,350,000.00 based on 188 units. (Lasberg, 20 Tr. 2225–27; *see* Mitchell, 1 Tr. 99; *see also* 1/29/82 Mitchell Letter to Shamberg, Deft. Ex. 9, p. 1) The number of units available under the MFPD ordinance depends upon the size of the units. (Albert, 20 Tr. 2269) The MFPD ordinance permitted building more studio and one-bedroom units than two-bedroom units. (Albert, 20 Tr. 2269) Mr. Lasberg believed that he was legitimately entitled to

between 235 and 275 units, and that, even with the politics of the Newcastle Planning Board, he would obtain approval for between 175 and 195 units. (Lasberg, 20 Tr. 2226) On November 11, 1981, Mr. Mitchell wrote to Mr. Overmyer conveying Mr. Lasberg's offer (translated into $20,000.00 per acre of $2,340,000.00) with $50,000.00 down and closing in 18 to 24 months after subdivision approval was obtained. (Mitchell, 1 Tr. 99–100; Lasberg, 20 Tr. 2229; 11/11/81 Mitchell Letter to Overmyer, Deft. Ex. 8) Mr. Mitchell concluded his letter by stating that Mr. Lasberg was "ready, willing and able to sign a contract and proceed immediately." (11/11/81 Mitchell Letter to Overmyer, Deft. Ex. 8) Mr. Overmyer neither accepted nor rejected Mr. Lasberg's offer. (Mitchell, 1 Tr. 104–05) Instead, he told Mr. Mitchell that he needed some cash flow to cover taxes and interest on the mortgage. (Mitchell, 1 Tr. 104–05) He told Mr. Mitchell that at that time he was favoring the "subject to" sale concept. (Mitchell, 1 Tr. 105) Mr. Mitchell went back to Mr. Lasberg with Mr. Overmyer's request, and Mr. Lasberg offered to pay $60,000.00 to $100,000.00 per year during the "subject to" waiting period. (Mitchell, 1 Tr. 108–09; Lasberg, 20 Tr. 2229; *see* 1/29/82 Mitchell Letter to Shamberg, Deft. Ex. 9, p. 1) On January 29, 1982, Mr. Mitchell wrote to Stuart Shamberg, Mr. Lasberg's attorney, explaining the terms of the offer. (Mitchell, 1 Tr. 109–10; 1/29/82 Mitchell Letter to Shamberg, Deft. Ex. 9)

9.3 *The Constructive Trust/Equitable Lien Claim.* On August 25, 1981, Hadar commenced an adversary proceeding in the Telecasting Chapter 11, seeking relief from the Telecasting automatic stay with respect to the broadcast equipment leased by Hadar to Telecasting. (Hadar Adversary Proceeding Docket, Deft. Ex. 310) *Hadar Decision*, 23 B.R. 823. On September 29, 1981, FNBB was granted leave to intervene as a defendant in the Hadar adversary proceeding. (Hadar Adversary Proceeding Docket, Entry 17, Deft. Ex. 310) On October 23, 1981, FNBB filed an answer and counterclaim asserting claims to an equitable lien and a constructive trust on the assets of the Overmyer entities. (FNBB

Hadar Answer and Counterclaim, Ex. B to Deft. Ex. 71, prayers 2 and 3, p. 3) "Overmyer entities" was defined as "a vast number of corporations" "owned or controlled" by Mr. Overmyer, including Telecasting, Hadar and ISLI, the then parties to the Hadar adversary proceeding. (FNBB Hadar Answer and Counterclaim, Ex. B to Deft. Ex. 71, para. 1, p. 1) After Mr. Overmyer, DHO Co. and Overmyer Distribution Services, Inc. intervened as plaintiffs, Telecasting and FNBB asserted similar claims in their answers and counterclaims to the complaints filed by each of them. (*E.g.,* FNBB DHO Co. Answer and Counterclaim, Ex. D to Deft. Ex. 71, para. 1 and prayers 3 and 4, pp. 1, 7; Telecasting DHO Co. Answer and Counterclaim, Ex. E to Deft. Ex. 71, prayers 1 and 3, p. 2) On December 8, 1981, at the deposition of Expediter Warehouse Company by Stuart K. Strang, Mr. Hopkins, counsel for FNBB, expanded on the constructive trust claim by announcing that Telecasting and FNBB were, in particular, attempting to impress a constructive trust on the assets of Weathervane Farms, Inc. ("Weathervane"). (Expediter Deposition, 16 Tr. 1690, 1698–1701) Mr. Brown, who represented the witness, requested that the reporter get this exchange typed up quickly. (Expediter Deposition, 16 Tr. 1699)

**9.4** *The $2,000.00 "Personal" Check.* On January 11, 1982, Mr. Overmyer sent Mr. Robson check number 1784 drawn on the account of Omega Executive Services Corp. to the order of Robson & Miller in the amount of $1,000.00. (1/11/82 Omega Check, Deft. Ex. 224; Omega Cash Disbursements Journal, Check No. 1784 "Void," Deft. Ex. 222, p. 1) On January 13, 1982, Mr. Robson returned the check to Mr. Overmyer with his personal letter requesting that Mr. Overmyer "replace this check with a check of yours personally." (1/13/82 Robson Letter to Overmyer, Deft. Exs. 224, 221) On January 25, 1982, Mr. Overmyer caused Omega Executive Services Corp. to write him a check for $2,000.00 as a "loan." (Carrieri, 3 Tr. 267–68; Omega Cash Disbursements Journal, Check No. 1823, Deft. Ex. 27, p. 8) Mr. Overmyer then wrote his personal check to Robson & Mil-

ler on Thursday, January 28, 1982. (6/25/82 Overmyer Personal Bankruptcy Schedules, Deft. Ex. 223, last page; Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit "A", Deft. Ex. 23, p. 15; *see* Miller, 27 Tr. 3329–30; Robson, 19 Tr. 2172–73) Mr. Robson denied having any recollection of what services the Robson Firm was performing for Mr. Overmyer and his entities in January, 1982. (Robson, 13 Tr. 1265–66) The source of the $2,000.00 check is listed as "Unknown" in the Robson Firm's Interrogatory Answers. (Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit "A", Deft. Ex. 23, p. 15) With the exception of one check received during the first month of the Robson Firm's existence, when the Robson Firm may not have been "organized" (Miller, 6 Tr. 575, 7 Tr. 631–32), this is the only Overmyer check in six years for which the Robson Firm was unable to identify the source. (Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit "A", Deft. Ex. 23; Miller, 7 Tr. 631–32; *cf.* Robson, 19 Tr. 2175) Mr. Robson denied knowing where the $2,000.00 check came from (Robson, 12 Tr. 1233–36, 13 Tr. 1265–66, 19 Tr. 2162), and repeatedly denied any memory or knowledge of ever having received a personal check from Mr. Overmyer (Robson, 12 Tr. 1820; 13 Tr. 1316–18, 19 Tr. 2169, 2170, 2172, 2173). Mr. Robson's request that an Overmyer corporate check be replaced with Mr. Overmyer's personal check is inconsistent with the established arrangement between Mr. Robson and Mr. Overmyer that checks from Mr. Overmyer's corporate entities would cover work done for any Overmyer entity, including Mr. Overmyer himself. (*See* Finding 4.6, *supra*) Neither Mr. Robson nor Mr. Miller had any explanation for the inconsistency. (Robson, 19 Tr. 2173–74; Miller, 27 Tr. 3330–31)

**9.5** *Mr. Overmyer's Sudden Change of Heart.* On the weekend of January 30–31, 1982, two days after the $2,000.00 check was received by the Robson Firm and one day after Mr. Mitchell spelled out the terms of the Lasberg offer for Mr. Las-

berg's attorney, Mr. Overmyer met with Mr. Mitchell at Mr. Overmyer's home. (Mitchell, 1 Tr. 95) Mr. Overmyer informed Mr. Mitchell that he wanted to sell the Lady Gabriel estate "immediately and for all cash without any conditions." (Mitchell, 1 Tr. 113) Mr. Mitchell argued "that this [was] not the way to sell [the property], that the subject to sale [would] get by far the best price and that a sudden sell it as is move would simply make a very substantial loss for him." (Mitchell, 1 Tr. 114) Mr. Overmyer reiterated: "I want to sell it now, all cash, without conditions." (Mitchell, 1 Tr. 114) Mr. Overmyer gave Mr. Mitchell no reason at that time for his sudden change of heart. (Mitchell, 1 Tr. 113–14) Later, Mr. Overmyer told Mr. Mitchell "that the bank was going to grab it and he wanted to sell it quickly." (Mitchell, 2 Tr. 159, admitted into evidence at 27 Tr. 3280) On Monday, February 1, 1982, Mr. Mitchell wrote to Mr. Overmyer pleading with him to reconsider a sale of the 117–acre parcel either to Mr. Lasberg or to one of the other local developers "for a price of $20,000.00 per acre ($2,340,000.00) on a 'subject to' basis, asking for $100,000.00 per year during the approval period, not to exceed two years." (2/1/82 Mitchell Memorandum to Overmyer, Deft. Ex. 10; Mitchell, 1 Tr. 113) Rather than heeding Mr. Mitchell's advice, Mr. Overmyer embarked on a precipitous liquidation of his Westchester real estate. He immediately listed both the remaining 61 acres of the Lady Gabriel estate and his own adjacent residence with A.T. Houlihan, Inc. and Sotheby Parke Bernet International Realty Corporation, without making any of the repairs and cosmetic improvements that Mr. Mitchell advised him would be necessary to obtain top price. (Mitchell, 2 Tr. 125–27; 2/2/82 Weathervane Listing Agreement, Deft. Ex. 11) Mr. Mitchell carried out Mr. Overmyer's instructions on the sale of the 117–acre parcel by going back to the developers and soliciting immediate, all cash offers. (Mitchell, 3 Tr. 207–08) Because of Mr. Overmyer's sudden change of heart, Mr. Mitchell had only a matter of days to attempt to obtain immediate cash offers. (Mitchell, 3 Tr. 225) Mr. Mitchell

had essentially dropped any efforts to obtain immediate cash offers after Mr. Lasberg agreed to meet Mr. Overmyer's asking price. (Mitchell, 3 Tr. 226–27) Arnold Teasdale, a local developer, in concert with Yorkville Federal Savings and Loan Association, offered $700,000.00 for the 117–acre parcel (slightly less than $6,000.00 per acre) on an immediate cash basis. (Mitchell, 1 Tr. 119–20) On February 10, 1982, Mr. Mitchell wrote to Mr. Overmyer informing him of Mr. Teasdale's offer with his opinion that it was "atrocious." (2/10/82 Mitchell Letter to Overmyer, Deft. Ex. 13; Mitchell, 2 Tr. 130–31; cf. Mitchell, 3 Tr. 201) Mr. Mitchell's opinion was echoed by Mr. Albert's opinion that the Teasdale offer was "preposterously low" (Albert, 20 Tr. 2299–2300) and Mr. Lasberg's opinion that the Teasdale offer "was the steal of the century" (Lasberg, 20 Tr. 2231). On that very day, February 10, 1982, Mr. Overmyer conveyed to Nancy Zeckendorf a vacant parcel of the land of Intermodal Terminals, Inc., on which his residence was located and on which FNBB sought to impress a constructive trust. (2/10/82 Intermodal Terminals Deed to Zeckendorf, Deft. Ex. 238) In his February 10, 1982 letter conveying Mr. Teasdale's offer to Mr. Overmyer, Mr. Mitchell advised: "We believe they would increase it to $750,000.00, but the evidence so far indicates that is their maximum dollar." (2/10/82 Mitchell Letter to Overmyer, Deft. Ex. 13) Mr. Overmyer immediately accepted Mr. Teasdale's $700,000.00 cash offer (Mitchell, 1 Tr. 121–22, 2 Tr. 131; see 2/18/82 Mitchell-Teasdale Memorandum of Agreement, Deft. Ex. 14, p. 1), even though it was less than one-third of the $20,000.00 per acre on which Mr. Overmyer had previously insisted (Mitchell, 1 Tr. 96; see Albert, 20 Tr. 2315–16). On February 19, 1982, Mr. Mitchell sent a memorandum of agreement to Mr. Shamberg, Mr. Teasdale's attorney, and sent a copy to Mr. Connery, Mr. Overmyer's house counsel. (2/19/82 Mitchell Letter to Shamberg, Deft. Ex. 15; 2/19/82 Mitchell Letter to Connery, Deft. Ex. 16; 2/18/82 Mitchell-Teasdale Memorandum of Agreement, Deft. Ex. 14; Mitchell, 2 Tr. 131–33) Mr. Teasdale executed the memorandum of

agreement with changes added by Mr. Shamberg, and returned it to Mr. Mitchell, who sent an executed copy to Mr. Connery on February 23, 1982. (2/23/82 Mitchell Letter to Connery, Deft. Ex. 17; 2/18/82 Memorandum of Agreement, Deft. Ex. 14; Mitchell, 2 Tr. 132–34) On February 24, 1982, Mr. Mitchell sent Mr. Teasdale a formal contract of sale. (2/24/82 Mitchell Letter to Teasdale, Deft. Ex. 18; Mitchell, 2 Tr. 134–35) The formal contract of sale of the 117–acre parcel for $700,000.00 was initially drafted by Mr. Singleton, Mr. Mitchell's attorney, was redrafted by Mr. Shamberg, Mr. Teasdale's attorney, was sent to Mr. Connery and was thereafter executed. (Mitchell, 3 Tr. 210–11; 2/82 Weathervane Contract of Sale to Chappaqua Building Corporation and Yorkville Equities Corp., Deft. Ex. 19; Mitchell, 2 Tr. 134–35)

**9.6** *Mr. Robson's Knowledge of the Constructive Trust Claim.* Mr. Robson was deposed in the Hadar adversary proceeding on December 7, 1981. (Robson Dep., 16 Tr. 1707) Mr. Robson learned of the constructive trust claim asserted by Telecasting and FNBB no later than early March, 1982. Trial of the Hadar adversary proceeding began on February 22, 1982. (Hadar Adversary Proceeding Docket, 2/22/82 Entry, Deft. Ex. 310) On March 3, 1982, Mr. Connery, house counsel for the Overmyer entities, wrote to Mr. Robson with copies to Gary Blum and Fred Weinberg, general bankruptcy counsel for DHO Co., Craig Bright and Richard Parsons, counsel for the custodial receiver of DHO Co., and William Fabrizio, counsel for the creditors' committee of DHO Co., enclosing copies of various papers from the Hadar adversary proceeding. (3/3/82 Connery Letter to Robson, Deft. Ex. 148; Robson, 15 Tr. 1667–68) The letter expressly states that the enclosures included the complaints filed by DHO Co. and Mr. Overmyer (3/3/82 Connery Letter to Robson, Deft. Ex. 148, p. 2) and the application filed by DHO Co. in the studio lease case (3/3/82 Connery Letter to Robson, Deft. Ex. 148, p. 3; *see Hadar Decision,* 23 B.R. at 883–85, Finding 26; *In re D.H. Overmyer Telecasting Co.,* 29 B.R. 645 [Bankr. N.D. Ohio

1983]). It also refers to unspecified "papers" being enclosed. (3/3/82 Connery Letter to Robson, Deft. Ex. 148, p. 2) These "papers" included the answers and counterclaims filed by Telecasting and FNBB. Mr. Fabrizio's time entry for March 4, 1982, submitted as part of the interim fee application of Hahn & Hessen in the Warehouse Chapter XI records 1.25 hours for "reviewing Robson letter [*i.e.,* Mr. Connery's letter *to* Mr. Robson] & Telecasting-Hadar pleadings." (8/11/82 Hahn & Hessen Interim Fee Application, 3/4/82 WRF (William R. Fabrizio) Time Slip, Deft. Ex. 199) On March 15, 1982, Mr. Connery wrote to Mr. Robson and Mr. Blum and began the letter: "I have forwarded to each of you the principal pleadings in connection with the intervention of D.H. Overmyer Co., Inc. in the application brought by Hadar in the Telecasting case in Cleveland seeking the payment of rent as lessor to Telecasting. As you will note from the pleadings, the Bank has set up a claim on the loan balances due and it alleges the warehouse company owes at the present time with interest about $20 million." (3/15/82 Connery Letter to Robson and Blum, Deft. Ex. 70, p. 1) The pleadings that Mr. Connery stated he had already forwarded to Mr. Robson included FNBB's answer and counterclaim to the DHO Co. complaint in the Hadar adversary proceeding in which FNBB alleged an indebtedness "in excess of $20,000,000" and prayed for a constructive trust and an equitable lien on the assets of the Overmyer entities. (3/31/82 Application of Debtor-In-Possession, Deft. Ex. 71, Exhibit D, para. 2 and prayers 3 and 4, pp. 2, 7) By contrast, in its original answer and counterclaim filed several months earlier, FNBB had alleged the amount then due as "in excess of $18,000,000." (3/31/82 Application of Debtor-In-Possession, Exhibit B, para. 2, p. 1) The Robson Firm also received the Telecasting and FNBB pleadings from Calfee, Halter & Griswold, the Cleveland counsel for DHO Co. (3/3/82 Calfee Halter Letter to Venditto, Deft. Ex. 200; Draft DHO Co. Application To Retain Calfee Halter, Exhibits B, D and E, Deft. Ex. 201) Calfee, Halter & Griswold was representing DHO Co., but

had not been retained in the Warehouse Chapter XI, and was being paid ostensibly by a Bermuda family trust controlled by Mr. Overmyer. (Draft DHO Co. Application To Retain Calfee Halter, p. 7 and Exhibit C, Deft. Ex. 201; Calfee Halter Statements of Fee Arrangements, Deft. Exs. 313–15) On March 3, 1981, Calfee, Halter & Griswold wrote to Michael J. Venditto, who was then an associate at the Robson Firm, enclosing a draft of an "Application of Debtor-In-Possession For Retention Of Calfee, Halter & Griswold As Counsel." (3/3/82 Calfee Halter Letter to Venditto, Deft. Ex. 200; Robson, 18 Tr. 2051) The enclosed draft "APPLICATION OF DEBTOR–IN–POSSESSION FOR RETENTION OF CALFEE, HALTER & GRISWOLD AS COUNSEL" had attached as exhibits (A) the "Application" filed by DHO Co. in the Studio Lease case, (B) the original October 23, 1981 answer and counterclaim filed by FNBB in the Hadar adversary proceeding, (C) the complaint filed by DHO Co. in the Hadar adversary proceeding, (D) the answer and counterclaim filed by FNBB in response to the DHO Co. complaint in the Hadar proceeding, (E) the answer and counterclaim filed by Telecasting in response to the DHO Co. complaint in the Hadar adversary proceeding, and (F) an "AFFIDAVIT OF WM. TOUSLEY SMITH, ESQ., IN SUPPORT OF APPLICATION" executed by Mr. Smith of Calfee, Halter & Griswold on March 3, 1982. (Draft DHO Co. Application to Retain Calfee Halter, Deft. Ex. 201; 3/3/82 Calfee Halter Letter to Venditto, Deft. Ex. 200; Robson, 18 Tr. 2052–55) The FNBB answers and counterclaims asserted constructive trust claims against the assets of all Overmyer entities. (Draft DHO Co. Application To Retain Calfee Halter, Exhibit B, prayer 3, p. 3, Exhibit D, prayer 4, p. 7, Deft. Ex. 201) The cover letter from Calfee, Halter & Griswold expressly referred to the enclosure of the "Affidavit of Wm. Tousley Smith, Esq., In Support of Application." (3/3/82 Calfee Halter Letter to Venditto, Deft. Ex. 200) Mr. Robson eventually admitted that he knew that the Overmyer entities against which FNBB sought a constructive trust included Weathervane. (Robson, 19 Tr.

2134–35, 2144–45; *see* Robson, 15 Tr. 1597–98, 1599–1600) The Telecasting answer and counterclaim contained a constructive trust claim similar to that of FNBB, but limited to the assets of DHO Co. (Draft DHO Co. Application To Retain Calfee Halter, Exhibit E, prayer 1, p. 2, Deft. Ex. 201) The distinction is of no significance, however, because Mr. Robson considered Telecasting and FNBB to be indistinguishable after FNBB took over control of Telecasting. (Robson Pro Haec Vice Testimony, 16 Tr. 1741; Robson, 11 Tr. 1125, 15 Tr. 1593) Mr. Overmyer signed the draft "Application of Debtor-In-Possession for Retention of Calfee, Halter & Griswold as counsel" on March 5, 1982, and Mr. Connery returned it to Mr. Venditto on March 6. (3/6/82 Connery Handwritten Note on Draft DHO Co. Application To Retain Calfee Halter, Deft. Ex. 201, p. 1) Mr. Venditto's DHO Co. time charges show that he reviewed the Calfee application on March 10, 1982. (Robson, Miller & Osserman Final DHO Co. Fee Application, Exhibit I, March 1982 Monthly Summary of Time Charges, Deft. Ex. 265) On March 18, 1982, Mr. Connery sent Mr. Venditto a memorandum suggesting revisions to the "Application of Debtor-In-Possession for Retention of Calfee, Halter & Griswold as Counsel." (3/18/82 Connery Memo to Venditto, Deft. Exs. 146, 147) Mr. Connery's suggested revisions included the addition of a new paragraph 5 expressly referring to FNBB's claim of a constructive trust on the assets of the Overmyer entities:

5. On September 29, 1981, over the objections of Hadar, the Bankruptcy Court permitted FNBB to intervene in the Hadar Litigation as the sole shareholder of Telecasting. On October 23, 1981, FNBB filed an answer and counterclaim to Hadar's complaint (see Exhibit "B" hereto), wherein FNBB asserted that Daniel H. Overmyer "owned or controlled a vast number of corporations"; that at various times various of the Overmyer entities had borrowed from and were indebted to FNBB in an amount in excess of $18 million and that said Overmyer entities conspired to defraud FNBB. FNBB prayed for the establish-

ment of an equitable lien and the imposition of a constructive trust on the assets of the Overmyer entities in an amount in excess of $18 million.

(3/18/82 Connery Memo to Venditto, Deft. Exs. 146, 147, p. 2) Mr. Venditto sent Mr. Connery's memorandum to Mr. Robson with the handwritten note: "Mort—Is this O.K.?" (3/18/82 Connery Memo to Venditto, Deft. Ex. 147, p. 1; Venditto Dep. 25 Tr. 3029; *cf.* Robson, 15 Tr. 1651–52) Mr. Robson sent the memorandum back to Mr. Venditto with his own handwritten note: "I still haven't seen a paragraph explaining why DHO [Co.] intervened and why court permission wasn't obtained beforehand." (3/18/82 Connery Memo to Venditto, Deft. Ex. 147, p. 1; Venditto Dep., 25 Tr. 3030; Robson, 15 Tr. 1652) Mr. Venditto already knew about the constructive trust claim when he received Mr. Connery's memorandum. (*See* Venditto Dep., 25 Tr. 3031–35; 3/31/82 Application of Debtor-In-Possession, Deft. Ex. 71, para. 6, p. 3) Earlier in March, Mr. Robson had told him that FNBB was seeking a constructive trust on the assets of the Overmyer entities. (Venditto Dep., 25 Tr. 3032–33) The Robson Firm used the draft "Application of Debtor-In-Possession for Retention of Calfee, Halter & Griswold as Counsel" to prepare the "Application of Debtor-In-Possession" that the Robson Firm filed on March 31, 1982. (*Compare* 3/31/82 Application of Debtor-In-Possession, Deft. Ex. 71, *with* Draft DHO Co. Application to Retain Calfee Halter, Deft. Ex. 201, *and* Connery Memo to Venditto, Deft. Exs. 146, 147; *see* Draft DHO Co. Application To Retain Calfee Halter with Connery Handwritten Revisions, Deft. Exs. 202, 146, 147; Robson, Miller & Osserman Final DHO Co. Fee Application, Exhibit I, March 1982 Monthly Summary of Time Charges, Venditto Entries for 3/10/82, 3/29/82, 3/30/82, 3/31/82, Deft. Ex. 265; Robson, 18 Tr. 2055–61) The Robson Firm used the same photocopies of pleadings that were sent to it by Calfee, Halter & Griswold with the draft "Affidavit of Debtor-In-Possession for Retention of Calfee, Halter & Griswold as Counsel" as the exhibits to the final "Application of Debtor-In-Possession" that

it filed on March 31, 1982. (*Compare* Draft DHO Co. Application to Retain Calfee Halter, Exhibits A–E, Deft. Ex. 201, *with* 3/31/82 Application of Debtor-In-Possession, Exhibits A–E, Deft. Ex. 71; Robson, 18 Tr. 2055–61) Comparison of the idiosyncrasies of the photocopy of the "Application of Debtor-In-Possession" that is in evidence with those of the photocopy of the draft "Application of Debtor-In-Possession for Retention of Calfee, Halter & Griswold as Counsel" that is in evidence showed that the original exhibits were identical right down to flaws in typing and photocopying. (Robson, 18 Tr. 2055–61; *compare* Draft DHO Co. Application To Retain Calfee Halter, Exhibits A–E, Deft. Ex. 201, *with* 3/31/82 Application of Debtor-In-Possession, Exhibits A–E, Deft. Ex. 71) The change from an "Application of Debtor-In-Possession for Retention of Calfee, Halter & Griswold as Counsel" to an "Application of Debtor-In-Possession" is explained by the fact that on March 31, 1982, special counsel for Calfee, Halter & Griswold, the New York firm of Gelberg & Abrams, instructed the Robson Firm not to use the affidavit of Wm. Tousley Smith and not to seek the *nunc pro tunc* retention of Calfee, Halter & Griswold. (3/31/82 Gelberg & Abrams Letter to Venditto, Deft. Ex. 203; Robson, 18 Tr. 2065–68) As a result, the Robson Firm made a last minute revision to the title and text of the application and removed "Exhibit F," the affidavit of Mr. Smith, before filing the "Application of Debtor-In-Possession" on March 31, 1982. (Robson, Miller & Osserman Final DHO Co. Fee Application, Exhibit I, March 1982 Monthly Summary of Time Charges, Venditto Entry for 3/31/82, Deft. Ex. 265) A hearing was held on the "Application of Debtor-In-Possession" on April 1, 1982. (Robson, 13 Tr. 1337) On April 5, 1982, an order purporting to declare the participation of DHO Co. in the Hadar adversary proceeding to be a "nullity" was entered on a notice of settlement filed by the custodial receiver and a letter of response from the Robson Firm. (4/5/82 "Nullity" Order, Deft. Ex. 121; 4/2/82 Notice of Settlement, Deft. Ex. 197; 4/2/82 Robson Letter to Lewittes, Deft. Ex. 198) Telecasting and

FNBB were never given notice of either the April 1 hearing or the settlement of the April 5 order. (Robson, 18 Tr. 2041, 2042–43) After a hearing held on proper notice, this Court held that DHO Co. remained a party to the Hadar adversary proceeding and was bound by the judgment. *Hadar Decision*, 23 B.R. at 916, Finding 38.8. Mr. Overmyer later told Mr. Mitchell that Mr. Robson knew about the Weathervane Farms sale before it took place. (Mitchell, 2 Tr. 184–86, admitted into evidence at 27 Tr. 3280) Mr. Robson admitted at trial that he knew about the constructive trust claim of FNBB and Telecasting during the preparation of the "Application of Debtor-In-Possession." (Robson, 15 Tr. 1636)

9.7 *Mr. Robson's Participation in the Weathervane Sale.* Mr. Connery was supposed to handle the closing of the Weathervane sale, but he was required to be in Cleveland on the scheduled closing date to testify in the Hadar adversary proceeding. (Venditto Dep., 25 Tr. 3035; 3/10/82 Connery Letter to Venditto, Deft. Ex. 294) As a result, the Robson Firm was asked to handle the closing. (Venditto Dep., 25 Tr. 3035) Mr. Robson personally assigned the work on the Weathervane closing to Mr. Venditto. (Venditto Dep., 25 Tr. 3035–36; Robson, 19 Tr. 2107–08) Mr. Robson told Mr. Venditto that he was to "handle the closing" of "a sale of some land in Westchester." (Venditto Dep., 25 Tr. 3036; *see* Robson, 8 Tr. 889–91, 19 Tr. 2108) Mr. Robson was familiar with the Overmyer real estate in Westchester County because he had previously attended social functions both at Mr. Overmyer's home and at the Lady Gabriel estate that was the home of Barbara and Stuart Strang, Mr. Overmyer's daughter and son-in-law. (Robson, 14 Tr. 1452–53, 15 Tr. 1601–02; Raible, 23 Tr. 2691) On March 10, 1982, Mr. Connery sent Mr. Venditto a letter of instructions in which he explained that title to the real estate was held by Weathervane. (3/10/82 Connery Letter to Venditto, Deft. Ex. 294) Mr. Venditto prepared a deed, reviewed the title report and dealt with some problems of requalification of Weathervane. (Venditto Dep., 25 Tr. 3036–37; *see* Robson, 12 Tr. 1188–89, 19 Tr. 2107) Mr. Venditto also

obtained a postponement of the closing to allow time to satisfy the mortgage on the property. (3/11/82 Venditto Letter to Shamberg, Deft. Ex. 295) As a result, Mr. Connery was able to attend the closing with Mr. Venditto. (Venditto Dep., 25 Tr. 3037) As it turned out, Mr. Connery and Mr. Strang attended without Mr. Venditto, because Mr. Venditto's car broke down. (Venditto Dep., 25 Tr. 3037) The closing occurred on March 19, 1982, the twentieth day of trial in the Hadar adversary proceeding. (3/19/82 Weathervane Deed, Deft. Ex. 20; Hadar Adversary Proceeding Docket, 3/19/82 Entry, Deft. Ex. 310) On the day of the closing, March 19, 1982, Mr. Robson caused a bill for $2,000.00 for the work on the Weathervane closing to be sent to Weathervane (3/19/82 Robson Bill to Weathervane, Deft. Ex. 205), five bills for Overmyer personal work to be sent to Mr. Overmyer (3/19/82 Robson Bills to Mr. Overmyer, Deft. Exs. 206, 207, 208, 209, 210) and two bills for personal work to be sent to Mr. Strang (3/19/82 Robson Bills to Strang, Deft. Exs. 211, 212), all directed to Mr. Overmyer's offices at 3 Park Avenue. (Venditto, Dep., 25 Tr. 3039–40; *cf.* Robson, 19 Tr. 2105–12) On March 23, 1982, Mr. Connery sent Mr. Venditto a $2,000.00 check of Omega Executive Services Corp. for the work on the Weathervane closing. (2/23/82 Connery Letter to Venditto, Deft. Ex. 213; Venditto Dep., 25 Tr. 3040–41; Robson, Miller & Osserman Second Amended Interrogatory Answer, Exhibit A, Deft. Ex. 23, p. 15) The $2,000.00 came out of the proceeds of the Weathervane sale. (Weathervane Receipts and Disbursements Journal, Deft. Ex. 26, pp. 1, 5; Omega Bank Statement and Deposit Records, Deft. Ex. 28; Omega Receipts and Disbursements Journal, Deft. Ex. 27, p. 1; 2/23/82 Connery Letter to Venditto, Deft. Ex. 213; *see* Carrieri, 3 Tr. 253–54) After the closing, Mr. Venditto obtained documentation that a judgment that appeared to be a lien on the property had been vacated (3/22/82 Venditto Letter to Connery, Deft. Ex. 296) and received and transmitted to Mr. Connery the original assignment of mortgage to Yorkville Federal Savings and Loan Association (4/8/82 Venditto Letter

to Connery, Deft. Ex. 297). The Robson Firm was later sent a copy of the closing binder that was prepared by Mr. Connery on the March 19 closing. (Weathervane Closing Binder for 3/19/82 Closing, Deft. Ex. 298; Venditto Dep., 25 Tr. 3041; Weathervane Closing Binder for 3/19/82 Closing, Deft. Ex. 285; Raible, 23 Tr. 2738–39) Prior to the closing on the 117–acre parcel of the Lady Gabriel estate, Mr. Overmyer asked Mr. Mitchell to attempt to sell the 61–acre parcel to Mr. Teasdale "on the same terms and conditions." (Mitchell, 2 Tr. 136–37) At the March 19 closing, Mr. Mitchell solicited an offer from Mr. Teasdale. (Mitchell, 2 Tr. 138) Mr. Teasdale offered "$715,000, all cash, close immediately." (Mitchell, 2 Tr. 138) Mr. Overmyer accepted (Mitchell, 2 Tr. 139), and the sale of the 61–acre parcel to Mr. Teasdale for $715,000.00 (approximately $11,725.00 per acre) closed on April 15, 1982, less than one week after the close of evidence in the Hadar adversary proceeding (Mitchell, 2 Tr. 141; 4/82 Weathervane Contract of Sale to Chappaqua Building Corporation and Yorkville Equities Corp., Deft. Ex. 21; 4/15/82 Weathervane Deed, Deft. Ex. 22, Hadar Adversary Proceeding Docket, 4/9/82 Entry, Deft. Ex. 310). On April 20, 1982, Mr. Connery sent to Mr. Robson a $20,000.00 check of Omega Executive Services Corp. (4/20/82 Connery Letter to Robson, Deft. Ex. 214; Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit A, Deft. Ex. 23, p. 16) The $20,000.00 was part of the proceeds from the sale of the Lady Gabriel estate. (Carrieri, 3 Tr. 257, 262, 264–65; Weathervane Receipts and Disbursements Journal, Deft. Ex. 26, pp. 3, 5; Omega Bank Statement and Deposit Records, Deft. Ex. 28; Omega Receipts and Disbursements Journal, Deft. Ex. 27, pp. 2, 12) On May 5, 1982, Mr. Robson had a conference with Mr. Overmyer regarding Mr. Overmyer's very severe personal financial problems. (Robson, 19 Tr. 2120; Robson Firm Overmyer Personal Time Slips, Deft. Ex. 115, p. 2) Mr. Overmyer was "very pessimistic about the outcome" of the Hadar adversary proceeding. (Robson, 19 Tr. 2120) On that same day, May 5, 1982, the Robson Firm received three checks of Omega Executive Services Corp. in the respective amounts of $2,218.55, $15,000.00 and $15,000.00. (Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit A, Deft. Ex. 23, p. 16) The $32,218.55 was part of the proceeds from the sale of the Lady Gabriel estate. (Carrieri, 3 Tr. 257, 262, 264; Weathervane Receipts and Disbursements Journal, Deft. Ex. 26, pp. 3, 5, 7, 9; Omega Bank Statement and Deposit Records, Deft. Ex. 28; Omega Receipts and Disbursements Journal, Deft. Ex. 27, pp. 2, 3, 16) The $2,218.55 check was the payment for four of the March 19 bills sent to Mr. Overmyer personally; $176.50 for Three Elks Co., $1,085.60 for Seige, $686.45 for Kearney and $270.00 for Labriola. (Robson, 19 Tr. 2117–19; 3/19/82 Robson Bills to Mr. Overmyer, Deft. Exs. 206, 207, 208, 209) The $50,000.00 was a retainer for representing "all of the [Overmyer] entities that were going to be ... subject to the judgment, ultimately." (Robson, 19 Tr. 2132; *accord* Robson, 19 Tr. 2129, 2130, 2133–34, 2137–38, 2141–42, 2144–45) It was the "war chest" that Mr. Overmyer was amassing for litigation against Telecasting and FNBB. (Robson New York Dep., 17 Tr. 1865) Mr. Robson was attempting to obtain money from Mr. Overmyer from any source whatsoever. (Robson, 15 Tr. 1563; Robson New York Dep., 17 Tr. 1863) Mr. Robson admitted that he knew about the constructive trust claims of Telecasting and FNBB at the time he received the $50,000.00. (Robson, 15 Tr. 1620, 1625)

9.8 *The Robson Trust.* None of the proceeds of the Weathervane sale went to the Harrison M. Overmyer Trust, which owned 20 percent of Weathervane Farms, Inc. (6/20/83 Cook Hadar Adversary Proceeding Testimony, 27 Tr. 3231; 7/19/83 Cook Hadar Adversary Proceeding Testimony, 27 Tr. 3234) Mr. Overmyer caused $580,923.47 of the proceeds of the Weathervane sale to be transferred to D.H. Overmyer Company of Canada, Ltd. (Carrieri, 3 Tr. 260–62; Omega Bank Statement and Deposit Records, Deft. Ex. 28; Weathervane Receipts and Disbursements Journal, Deft. Ex. 26, pp. 1, 3, 5, 8, 9; Omega Receipts and Disbursements Journal, Deft.

Ex. 27, pp. 1, 2, 3, 10, 14) A $165,000.00 transfer was made five days after the receipt of $170,000.00 and a $415,923.47 transfer was made one day after the receipt of the identical amount. (Omega Bank Statement, Deft. Ex. 28, p. 1) Of the $580,923.47, $177,038.56 was simply transferred back to Omega Executive Services during March, April and May 1982, as Mr. Overmyer needed it. (Omega Receipts Journal, Deft. Ex. 27, pp. 1, 2, 3) D.H. Overmyer Company of Canada, Ltd. had sold its warehouses and had no business except the transfers of money. (Edgerton, 7 Tr. 618) On May 18, 1982, Mr. Robson met with Sidney Reich, who was ultimately retained by Mr. Overmyer to handle Mr. Overmyer's personal bankruptcy. (Robson, 12 Tr. 1242; Robson Firm Overmyer Personal Time Slips, Deft. Ex. 115, p. 9) On May 21, 1982, the Friday before the May 24 closing arguments in the Hadar adversary proceeding (Robson, 12 Tr. 1243–44), Mr. Robson entered into a trust agreement with Mr. Overmyer's daughter, Barbara Overmyer Strang, pursuant to which he agreed to hold property for the benefit of Mr. Overmyer's four children. (Robson, 12 Tr. 1189, 19 Tr. 2145; 5/21/82 Robson Trust Agreement, Deft. Ex. 215) Mr. Overmyer directed the establishment of the trust. (Robson, 12 Tr. 1241) Mrs. Strang was reluctant to enter into the trust agreement, but Mr. Overmyer wanted to do it and eventually persuaded her to do so. (Robson, 12 Tr. 1241, 15 Tr. 1574) The trust was funded with a $250,000.00 "loan" "from Barbara Overmyer Strang" that was taken out of D.H. Overmyer Company of Canada, Ltd. (Robson, 12 Tr. 1189–90, 1240–41, 19 Tr. 2114, 2145–47, 2149; 5/21/82 Promissory Note from Barbara Overmyer Strang to DHO Canada, Deft. Ex. 216; 5/21/82 Loan Agreement Between Barbara Overmyer Strang and DHO Canada, Deft. Ex. 217; 5/26/82 Caccamo Letter to Barbara Strang with 5/21/82 $250,000 Credit Advice, Deft. Ex. 218) The $250,000.00 was part of the proceeds of the Weathervane sale. (Carrieri, 3 Tr. 260–62; Edgerton, 7 Tr. 613–15; Omega Bank Statements and Deposit Records, Deft. Ex. 28; Weathervane Receipts and Disburse-ments Journal, Deft. Ex. 26, pp. 1, 3, 5, 7, 9; Omega Receipts and Disbursements Journal, Deft. Ex. 27, pp. 1, 2, 3, 10, 14; Edgerton Handwritten Notes on $250,000 Transfer, Deft. Ex. 61; 5/21/82 $250,000 Credit Advice, Deft. Ex. 62; *compare* 5/21/82 $250,000 Credit Advice, Deft. Ex. 62, *with* 5/21/82 $250,000 Credit Advice Attached to 5/26/82 Caccamo Letter to Barbara Strang, Deft. Ex. 218, p. 2) Mr. Robson took $10,000.00 out of the trust as a "fee." (Robson, 19 Tr. 2148; *contra* Robson New York Dep., 17 Tr. 1879) The receipt of this money was concealed by Mr. Robson by omitting it from the list of "Payments Received by Robson Firms" that was filed under oath in response to an interrogatory propounded by Telecasting. (Robson, 19 Tr. 2149; Miller, 27 Tr. 3328; *cf.* Robson, Miller & Osserman Second Amended Interrogatory Answers, Deft. Ex. 23) On May 28, 1982, one week after the Robson Trust was established, Mr. Overmyer filed a personal Chapter 7 bankruptcy in the Southern District of New York, White Plains Division. (Robson, 15 Tr. 1618–19; 5/28/82 Overmyer Chapter 7 Petition, Deft. Ex. 145) Mr. Overmyer made an unsuccessful *ex parte* approach to this Court (6/21/82 Reich Letter to Judge Ray, Deft. Ex. 120) and unsuccessful *ex parte* approaches to a bankruptcy judge and two district judges in the Southern District of New York (Robson, 13 Tr. 1330–46), in an effort to use the automatic stay arising from the filing of his personal Chapter 7 bankruptcy, to prevent this Court from rendering a decision in the Hadar adversary proceeding. Mr. Robson invested a portion of the money transferred to the Robson trust in A.T. Houlihan, Inc. (Mitchell, 2 Tr. 167) The original stock issuance agreement executed by Mr. Robson (Houlihan Stock Agreement, Deft. Ex. 342, p. 13) provided for issuance of 50 percent of the stock of A.T. Houlihan, Inc. to the Robson trust. (Houlihan Stock Agreement, para. 1(a), Deft. Ex. 342, p. 2) Mr. Overmyer later changed the agreement to provide for issuance of 50 percent of the stock to the Harrison M. Overmyer trust. (Houlihan Stock Agreement, Deft. Ex. 342, p. 1) On June 20, 1983, Howard C. Cook, the trustee

of the Harrison M. Overmyer Trust, committed perjury before this Court to conceal the right of the Harrison M. Overmyer trust to subscribe to 50 percent of the stock of Chapoat B.C. Corporation which owned A.T. Houlihan, Inc. (*Compare* 6/20/83 Cook Hadar Adversary Proceeding Testimony, 27 Tr. 3224, 3227–28, *with* 7/8/83 Mitchell-Cook Telephone call Recording, 27 Tr. 3253–58, *and* 7/19/83 Cook Hadar Adversary Proceeding Testimony, 27 Tr. 3234–46) Mr. Robson admitted that he knew about the constructive trust claims of Telecasting and FNBB at the time the Robson Trust was established and funded. (Robson, 15 Tr. 1620, 1625)

9.9 *The Robson Mortgage.* During June 1982, Mr. Robson and the Robson Firm were working on a mandamus petition to the United States Court of Appeals for the Sixth Circuit, seeking to prevent this Court from rendering a decision in the Hadar adversary proceeding that was then under advisement. (Robson, 15 Tr. 1590–91, 1616–18, 18 Tr. 2086; Robson Firm Overmyer Personal Time Slips, 6/1/82 and 6/29/82 Robson Time Slips, Deft. Ex. 115, pp. 13, 19; Hadar Mandamus Petition, Deft. Exs. 122, 123) On June 25, 1982, Mr. Robson took a $500,000.00 bond secured by a $500,000.00 mortgage on the remainder of the Lady Gabriel estate that had not been sold by Weathervane. (Robson, 15 Tr. 1574, 18 Tr. 2082–85; Miller, 8 Tr. 767–69; 6/25/82 $500,000.00 Robson Bond, Deft. Ex. 73; 6/25/82 $500,000.00 Robson Mortgage, Deft. Ex. 72) Mr. Robson took the bond and mortgage on the same day that the Ohio Court of Appeals rendered its decision on the deliberate fraudulent conveyances made by Mr. Overmyer in the *LocaFrance* case. (6/25/82 LocaFrance Ohio Court of Appeals Decision, Deft. Ex. 75) Mr. Overmyer apparently led Mr. Robson to believe that the mortgage was on Mr. Overmyer's house (Robson, 15 Tr. 1570–71, 1599–1600); but Mr. Robson learned to his chagrin at trial that he too had been duped by Mr. Overmyer and the mortgage was, in fact, on the vacant remainder of the Lady Gabriel estate (Robson, 15 Tr. 1605–07). On June 30, 1982, Mr. Overmyer caused Intermodal Termi-

nals, Inc., which actually owned his home, to give a $430,000.00 mortgage and a $70,000.00 mortgage to A.T. Houlihan, Inc., as part of Mr. Overmyer's acquisition of the Houlihan real estate business, in which Mr. Overmyer was represented by Mr. Robson. (6/30/82 $430,000.00 Intermodal Terminals Mortgage to A.T. Houlihan, Inc., Deft. Ex. 236; 6/30/82 $70,000.00 Intermodal Terminals Mortgage to A.T. Houlihan, Inc., Deft. Ex. 237; Mitchell, 2 Tr. 164–67; *see* 6/28/82 Robson Time Slips, Deft. Ex. 219; 6/28/82 Robson Daily Diary, Deft. Ex. 220) Mr. Robson also took a guaranty from Weathervane, the Barbara Overmyer Trust and the Clark Trust "given as of the 29th day of June, 1982." (Robson, 18 Tr. 2085–88; Miller, 8 Tr. 777; 7/82 Guaranty Agreement, Deft. Ex. 204) The guaranty agreement is dated "this ____ day of July, 1982." (7/28 Guaranty Agreement, Deft. Ex. 204, p. 5) The guaranty agreement was still being drafted as late as July 26, 1982. (Robson, 18 Tr. 2086–87; Miller, 8 Tr. 781–83; 6/30/82 Caccamo Letter to Overmyer Enclosing Draft Guaranty Agreement, Deft. Ex. 76; 7/23/82 Caccamo Time Slips, Deft. Ex. 77; 7/26/82 Caccamo Time Slips, Deft. Ex. 78) The guaranty agreement was actually executed on an undetermined date on or after July 26, 1982. (Robson, 18 Tr. 2085–93; 7/82 Guaranty Agreement, Deft. Ex. 204) After Telecasting requested the production of all Weathervane-related documents in this adversary proceeding (9/18/84 Telecasting Document Request, Deft. Ex. 325), Mr. Robson deliberately delivered the Robson mortgage, the bond and the guaranty agreement to a Cleveland Grand Jury without retaining copies, in an effort to conceal them from Telecasting. (12/11/84 Grand Jury Subpoena, Deft. Ex. 144; Robson, 19 Tr. 2155) The guaranty agreement guaranteed "the prompt and complete payment of all outstanding indebtedness incurred by the Beneficiaries of legal services to date, with the exception of legal expenses incurred out of the Chapter XI proceedings, and for any and all legal expenses incurred by the Beneficiaries or any affiliated person, as that term is hereinafter defined, of any of the Beneficiaries in the future." (7/82 Guaranty Agree-

ment, para. 1, Deft. Ex. 204, p. 2) The Robson Firm's "Schedule of Time-Charge Values and Payments Received from Various Overmyer Entities by Robson Firms" shows that the Robson Firm has been paid $90,000.00 more than its recorded time charges for non-Chapter XI work. (Robson Firm Schedule of Time Charges and Payments, Deft. Ex. 65, pp. 9, 12; Robson, 18 Tr. 2094–95) The Robson mortgage was taken primarily to cover future, rather than past, legal fees. (Robson, 18 Tr. 2096–97; Robson New York Dep., 17 Tr. 1881) "This was an attempt again to provide us with some guaranty of payment for the service we expected to be rendering. This was all after the completion of the trial in Ohio in which Dan quite rightly anticipated being destroyed, and he believed and I believed that a long, drawn out battle would take place with the First National Bank of Boston...." (Robson New York Dep., 17 Tr. 1881) Mr. Robson has not "anywhere near used that $50,000" advance received from Omega Executive Services in April and May 198 (Robson, 15 Tr. 1567; *accord* Miller, 8 Tr. 778), and Mr. Robson has never returned or accounted for any of the money that was advanced (Robson New York Dep., 17 Tr. 1866). Neither Mr. Robson nor Mr. Miller was able to state at trial how much, if anything, the guaranty agreement guaranteed. (Robson, 18 Tr. 2095–96, 2100; Miller, 27 Tr. 3396) Nevertheless, Mr. Robson refused during the trial to release the Robson mortgage. (Robson, 28 Tr. 2099–2100); *see* Robson, 15 Tr. 1607) Mr. Robson admitted that he knew about the constructive trust claims of Telecasting and FNBB at the time he took the Robson mortgage. (Robson, 15 Tr. 1571) Mr. Robson thought he was free to take a mortgage, in spite of his actual personal knowledge of the constructive trust claims, because no *lis pendens* had been filed. (Robson, 15 Tr. 1588–90, 19 Tr. 2113–14; *contra* New York Debtor & Creditor Law §§ 278–79) On the last day of trial, after it became obvious that the Robson mortgage was invalid, the plaintiffs finally agreed to release it formally of record. (29 Tr. 3554–55)

9.10 *The Post-Judgment Transfers to the Robson Firm.* On Friday, September 17, 1982, this Court rendered its decision in the Hadar adversary proceeding, finding against Mr. Overmyer and the Overmyer parties in all respects. (Hadar Adversary Proceeding Docket, Entry 512, Deft. Ex. 310; *Hadar Decision*, 23 B.R. 823) On the following Monday, September 20, 1982, this Court entered an order upon banks, freezing the bank accounts of numerous Overmyer entities, including Weathervane, Omega Executive Services and Intermodal Terminals. (9/20/82 Order upon Banks, Deft. Ex. 166) On Friday, September 24, 1982, this Court entered a judgment in the Hadar adversary proceeding which, *inter alia*, granted Telecasting a constructive trust on the Lady Gabriel estate and vested a number of Overmyer entities in nominees of FNBB, including Expediter Warehouse Company and D.H. Overmyer Company of Canada, Ltd. (9/24/82 Judgment, paras. 8, 15, 18, Deft. Ex. 124, pp. 4–10, 13, 14) On September 26, 1982, the Robson Firm obtained an *ex parte* temporary restraining order in the Warehouse Chapter XI, enjoining the enforcement of the judgment against any assets or property of DHO Co. and the other Consolidated Debtors. (Robson Pro Haec Vice Testimony, 17 Tr. 1917–19; 9/26/82 Temporary Restraining Order, Deft. Ex. 178; *cf.* Robson, 13 Tr. 1373) The temporary restraining order was obtained without notice to the office of FNBB's Manhattan counsel, even though it was "physically possible for us to get over there." (Robson, 13 Tr. 1375) The Robson Firm filed another mandamus petition in the United States Court of Appeals for the Sixth Circuit on behalf of a myriad of Overmyer entities seeking to vacate the judgment. (Robson, 13 Tr. 1370; Robson Pro Haec Vice Testimony, 16 Tr. 1765–69; Wilkinson Mandamus, Deft. Ex. 125) Mr. Robson also filed appeals from the judgment on behalf of Mr. Overmyer, DHO Co. and ISLI. (Robson, 13 Tr. 1376, 1378, 1408–09) On September 30, 1982, a hearing was held in the Warehouse Chapter XI on the temporary restraining order and on a proposed sale of the Toledo warehouse owned by DHO Co. (9/30/82 DHO Co.

Transcript, Deft. Ex. 230) The contract of sale included a lease to Expediter Warehouse Company which had been vested in a nominee of FNBB. (9/22/82 Application To Sell Toledo Warehouse, para. 5(b)(iv), p. 8, and Exhibit D., Deft. Ex. 229) Mr. Robson told the Court that the Consolidated Debtors would amend the contract to eliminate Expediter Warehouse Company and substitute "a newly formed company without any prior history," "another empty corporation." (9/30/82 DHO Co. Transcript, Deft. Ex. 230, pp. 49, 50; Robson, 19 Tr. 2200–10) This amendment deprived FNBB of the prospective profit of Expediter Warehouse Company on the lease. (Robson, 19 Tr. 2206) Mr. Robson also attempted to extend the TOC automatic stay to the stock of D.H. Overmyer Company of Canada, Ltd., D.H. Overmyer Company (Quebec) Ltd., Overmyer Canada Ltd. and Intermodal Terminals, Inc., the company that owned Mr. Overmyer's home, all of which had been vested by the judgment in nominees of FNBB. (Robson, 21 Tr. 2342–53; compare 10/19/82 Robson Letter to Bienenstock, Deft. Ex. 235, p. 5, with 10/8/82 Bienenstock Letter to Robson, Deft. Ex. 234, p. 5; 9/24/82 Judgment, paras. 15, 16, Deft. Ex. 124, pp. 13–14) After the entry of the judgment in the Hadar adversary proceeding, the Robson Firm received $8,674.75 from D.H. Overmyer Company of Canada, Ltd.—$3,998.44 on October 4, 1982, $3,000.00 on October 26, 1982 and $1,676.31 on December 31, 1982. (Robson, 13 Tr. 1425–28; Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit A, Deft. Ex. 23, pp. 16–17; Robson Firm Schedule of Time Charges and Payments, Deft. Ex. 65, p. 11; 12/1/82 Requisition for Payment Transfer, Deft. Ex. 134, p. 2) At first, Mr. Robson disclaimed any knowledge or recollection of what these payments were for, but thereafter he claimed that they were for representing D.H. Overmyer Company of Canada, Ltd. and others in the Wilkinson mandamus case in attempting to vacate the September 24 judgment in favor of FNBB. (Robson, 13 Tr. 1419–22, 1428–30; see Wilkinson Mandamus, Deft. Ex. 125) Mr. Robson "received" these payments from D.H.

Overmyer Company of Canada, Ltd., because "I was anticipating I was going to be involved in substantial litigation, and Dan was expecting to have his assets tied up PDQ, so he was trying to feed me as much as he could in advance so that I would be able to represent him in what he anticipated would be a long, hard battle." (Robson New York Dep., 17 Tr. 1863) Mr. Robson admitted that he knew about the judgment vesting D.H. Overmyer Company of Canada, Ltd. in FNBB at the time he received the $3,998.44, $3,000.00 and $1,676.31 payments from D.H. Overmyer Company of Canada, Ltd. (Robson, 13 Tr. 1424, 1426, 1428)

9.11 *Mr. Robson's Concealment of the Fraudulent Conveyances.* Pursuant to Rule 219 of the Bankruptcy Rules of 1973, Mr. Robson was ordered by this Court, first, to file a disclosure in the Hadar Chapter 11 case of the compensation that he had been paid or promised for the Hadar mandamus and the sources thereof (Robson Pro Haec Vice Testimony, 16 Tr. 1726–27; 9/29/82 Order Upon Counsel, Deft. Ex. 155; cf. Robson, 19 Tr. 2121), and, after he failed to file a proper disclosure statement, to appear before this Court to make the required disclosures (Robson Pro Haec Vice Testimony, 16 Tr. 1716–18; 10/12/82 Order upon Counsel, Deft. Ex. 156; 10/21/82 Application for an Order upon Counsel, Deft. Ex. 158; 10/21/82 Order upon Counsel, Deft. Ex. 159; Robson, 19 Tr. 2124). Mr. Robson made repeated efforts to avoid appearing before this Court to explain the sources of his compensation. (Robson Pro Haec Vice Testimony, 16 Tr. 1718–20, 1724–26, 1737–38, 1739–52; 11/8/82 Order To Show Cause for Stay Pending Appeal, Deft. Ex. 161; 11/10/82 Memorandum of Opinion Denying Stay, Deft. Ex. 163; Royer Application for Stay Order, Deft. Ex. 164; 11/19/82 Order Denying Continuance, Deft. Ex. 165; Robson Firm Overmyer Personal Time Slips, 11/3/82 Robson Entry, Deft. Ex. 115, p. 40) Mr. Robson received $4,000.00 from Morton Telecasting, Inc., an Overmyer entity, on November 19, 1982, the Friday before he finally appeared in this Court for the first time on November 22. (Robson, 19 Tr.

2124; Robson, Miller & Osserman Second Amended Interrogatory Answers, Exhibit A, Deft. Ex. 23, p. 17) Mr. Robson could not recall why he got $4,000.00 from Morton Telecasting, Inc. (Robson New York Dep., 17 Tr. 1868–69) Mr. Robson concealed the sources of his compensation by filing false and deceptive affidavits (Robson Pro Haec Vice Testimony, 16 Tr. 1720–24, 1727–37, 1738–39, 1752–63; 10/13/82 Robson Affidavit in Reply to Order upon Counsel, para. 4, Deft. Ex. 157, p. 2; 10/27/82 Robson Affidavit in Reply to Order upon Counsel, paras. 4–5, Deft. Ex. 160, p. 2; Blumberg Form Statement, Deft. Ex. 162), and by lying under oath when he was finally forced to appear and testify about the compensation he had received and had been promised (Robson Pro Haec Vice Testimony, 16 Tr. 1719, 1721, 1728–29, 1731, 1735, 1736; Robson, 19 Tr. 2122, 2123–24, 2125–29).

9.12 *The Controlling Weathervane Fraud Decision.* On July 19, 1983, this Court entered a judgment based on the fraudulent conveyance of the Lady Gabriel estate. (10/17/83 Memorandum of Opinion Denying Stay of Weathervane Fraud Judgment, Deft. Ex. 225, p. 6) The losing parties sought a stay pending appeal, which was denied by this Court on October 17, 1983. (10/17/83 Memorandum of Opinion Denying Stay of Weathervane Fraud Judgments, Deft. Ex. 225) This Court found that "[t]he sale was made with deliberate, actual intent to hinder, delay and defraud FNBB in the collection of the obligations of Mr. Overmyer and his companies." (10/17/83 Memorandum of Opinion Denying Stay of Weathervane Fraud Judgment, Deft. Ex. 225, p. 4) Morton Robson was one of the losing parties. (Robson, 19 Tr. 2186–87) Mr. Robson and the other appellants appealed this Court's July 19, 1983 judgment, and that judgment was affirmed by the United States District Court for the Northern District of Ohio on July 11, 1984 (7/11/84 District Court Weathervane Fraud Order, Deft. Ex. 226), and by the United States Court of Appeals for the Sixth Circuit on March 7, 1986 (3/7/86 Court of Appeals Decision, Deft. Ex. 227).

Mr. Robson has already fully litigated, and lost, the issue of the Weathervane fraud.

9.13 *Mr. Miller's Innocence of the Weathervane Fraud.* Mr. Miller did not know about the constructive trust claims of Telecasting and FNBB, and did not personally commit, or personally participate in committing, the Weathervane fraud. (Miller, 8 Tr. 768)

9.14 *Telecasting's Damages.* Mr. Overmyer actually sold the Lady Gabriel estate for $1,415,000.00. (Mitchell, 1 Tr. 119, 121–22, 2 Tr. 139; 2/82 Weathervane Contract of Sale to Chappaqua Building Corporation and Yorkville Equities Corp., Deft. Ex. 19; 4/82 Weathervane Contract of Sale to Chappaqua Building Corporation and Yorkville Equities Corp., Deft. Ex. 21) The actual closing adjustments produced net cash proceeds of $840,947.93. (Klein, 25 Tr. 2919–22; Klein Weathervane Farms Damages Summary, Deft. Ex. 290) If the property had not been fraudulently conveyed, Telecasting could have realized $840,947.93 in March-April, 1982, even if it had sold the Lady Gabriel estate for the same price that Mr. Overmyer accepted from Mr. Teasdale in his haste to liquidate the real estate so that he could conceal the proceeds from Telecasting and FNBB. (*See* Mitchell, 2 Tr. 159, admitted into evidence at 27 Tr. 3280; 2/10/82 Mitchell Letter to Overmyer, Deft. Ex. 13; Mitchell, 2 Tr. 130–31; Albert, 20 Tr. 2299–2300; Lasberg, 20 Tr. 2231)

X. *More Robson Firm Conflicts*

10.1 *Efforts To Prevent or Avoid the Hadar Judgment.* On March 31, 1982, the twenty-eighth day of trial in the Hadar adversary proceeding, the Robson Firm, as "special counsel" to DHO Co., filed an "Application of Debtor-in-Possession" in the Warehouse Chapter XI, seeking to nullify the participation of DHO Co. in the Hadar adversary proceeding. (*See* Finding 9.6, *supra*) On July 23, 1982, while the Hadar adversary proceeding was under advisement, the Robson Firm filed a mandamus petition in the United States Court of Appeals for the Sixth Circuit, seeking to prevent this Court from rendering judgment. (Robson, 15 Tr. 1616–18; Hadar Mandamus

Petition, Deft. Exs. 122, 123) Immediately after the judgment was entered in the Hadar adversary proceeding, the Robson Firm obtained an *ex parte* temporary restraining order against its enforcement against DHO Co., attempted to bring the Canadian Overmyer companies and Mr. Overmyer's house within the TOC automatic stay and filed a second mandamus petition in the United States Court of Appeals for the Sixth Circuit on behalf of a plethora of Overmyer entities seeking to vacate the judgment. (*See* Finding 9.10, *supra*) The Robson Firm also appealed the Hadar judgment on behalf of Mr. Overmyer, DHO Co. and ISLI. (Robson, 13 Tr. 1376, 1378, 1408–09) When Telecasting filed an adversary proceeding in the Warehouse Chapter XI to obtain payment of the Hadar judgment as an administrative expense, the Robson Firm represented DHO Co. against Telecasting. (Robson, 13 Tr. 1409–10) The Hadar judgment in favor of Telecasting involved at least three matters on which the Robson Firm had previously represented Telecasting: the General Electric settlement (Robson, 13 Tr. 1378–79; *see* Finding VI, *supra*); the leases of equipment from Hadar to Telecasting (Robson, 13 Tr. 1388–98; 1410–11; 4/3/78 Robson Opinion Letter to Telecasting, Deft. Ex. 133); and the TOC interest payments to FNBB made with Telecasting funds to obtain a stay of the order dismissing the Telecasting Chapter XI (Robson, 13 Tr. 1401–03, 1404–05; *see* Finding 8.1, *supra*). Mr. Robson went from being retained as special counsel for Telecasting to represent Telecasting in the Warehouse Chapter XI (9/9/76 Ballon Stoll Retention "Petition," para. 5, Deft. Ex. 35, p. 2), to representing DHO Co. against Telecasting in connection with matters on which he had previously represented Telecasting. (Robson, 10 Tr. 1009–17)

10.2 *Metwest Distribution, Inc. and Rome Warehouse Company.* After the entry of the Hadar judgment vesting Expediter Warehouse Company in a nominee of FNBB, the Robson Firm amended the contract of sale of the Toledo warehouse to Cliffton Management Corporation to substitute "a newly formed company without any prior history," "another empty corporation" for Expediter as the lessee of a portion of the warehouse from Cliffton. (*See* Finding 9.10, *supra*) The company that was substituted for Expediter was Metwest Distribution, Inc. (Robson, 21 Tr. 2358–59, 2377–78; 12/21/82 Edgerton Letter to Robson, Deft. Ex. 244; 12/28/82 Miller Letter to Saccone, Deft. Ex. 245; *see* 11/17/82 DHO Co. Lease to Metwest, Deft. Ex. 239) Mr. Robson owned 12½ percent of Metwest. (Edgerton, 7 Tr. 619) The sale to Cliffton fell through before the modified contract could be submitted to the New York Bankruptcy Court for approval. (Robson, 21 Tr. 2392–93; 12/6/82 Beraznik Letter to Overmyer, Deft. Ex. 246) On November 12, 1982, Mr. Overmyer proposed to Finley, Kumble, Wagner, Heine, Underberg & Casey, with a copy to Mr. Robson, that three corporations whose names were to be supplied by Mr. Robson would purchase the three remaining leasehold interests owned by DHO Co., using $100,000.00 out of the fees allowed to Finley Kumble and $100,000.00 out of the fees allowed to the Robson Firm. (Robson, 21 Tr. 2362–64; 11/19/82 Overmyer Letter to Blum, Deft. Ex. 241) On November 23, 1982, Finley Kumble replied to Mr. Overmyer, with a copy to Mr. Robson, stating that the proposed transaction "in our judgment creates a conflict of interest between us and our client" and violates the Bankruptcy Act. (11/23/82 Blum Letter to Overmyer, Deft. Ex. 242, p. 1; *cf.* Robson, 21 Tr. 2365–70) Nevertheless, Mr. Robson and Mr. Overmyer persisted. On December 6, 1982, Rome Warehouse Company, either 40 or 45 percent of which was owned by Mr. Robson and his children, and either 40 or 45 percent of which was owned by Mr. Overmyer's children, made an offer to purchase the Los Angeles and Baltimore leaseholds of DHO Co. for $400,000.00, and to take an option to purchase the Rochester leasehold of DHO Co. for $50,000.00. (Robson, 21 Tr. 2370–76; 12/6/82 Robson Letter to Blum, Deft. Ex. 57; 12/6/82 Overmyer Letter to Rado, Deft. Ex. 243) On Thursday, December 29, 1982, an order to show cause was filed, with notice to be delivered or mailed on or before Friday, December 30, 1982, scheduling a hearing

on approval of the sale to Rome Warehouse Company for Thursday, January 5, 1983, only three days after the New Year's holiday. (Robson, 21 Tr. 2384–89; 12/29/82 Order To Show Cause, Deft. Ex. 58) The sale of the DHO Co. leaseholds to Rome Warehouse Company for $450,000.00 had to be abandoned when counsel for the DHO Co. creditors' committee pointed out that the transaction would violate the United States Criminal Code, 18 U.S.C. § 154. (Robson, 21 Tr. 2389–92; Miller, 6 Tr. 546–48, 549–50; 2/15/83 Fabrizio Letter to Bright with Copy to Robson, Deft. Ex. 59) *See Karbach Enterprises v. Exennium, Inc. (In re Exennium, Inc.)*, 23 B.R. 782, 787 (Bankr. 9th Cir.1982), *rev'd on other issues*, 715 F.2d 1401 (9th Cir.1983). When the DHO Co. leaseholds were later sold, the prices were $205,000.00 for the Rochester leasehold, $300,000.00 for the Baltimore leasehold and $1,200,000.00 for the Los Angeles leasehold. (Raible, 23 Tr. 2725–26)

10.3 *Brentgate Limited and Ellesmere Corporation.* On February 9, 1983, Continental Distributors Ltd., an independent third party, made an offer to purchase the remaining warehouse assets of DHO Co. (2/9/83 Lubitz Letter to Overmyer, Deft. Ex. 247; Robson, 21 Tr. 2397–99) On February 24, 1983, a competing offer to purchase the Toledo warehouse and the Los Angeles, Baltimore and Rochester leaseholds for $4,100,000.00, with $41,000.00 down, was "received" by DHO Co. from Brentgate Limited of 78 South Audley Street in London, England. (Robson, 21 Tr. 2405–07; 2/24/83 Brentgate Limited Letter to Bolger, Deft. Ex. 248) The Brentgate offer was signed by one David Gough. (2/24/83 Brentgate Limited Letter to Bolger, Deft. Ex. 248) It was on a typewritten letterhead. (2/24/83 Brentgate Limited Letter to Bolger, Deft. Ex. 248) Mr. Robson denied in his deposition taken in connection with the Robson Firm's fee application in the Warehouse Chapter XI that he had ever met Mr. Gough, but he now admits that he met Mr. Gough at least once. (Robson, 21 Tr. 2405–06; *see* Edgerton, 6 Tr. 626, 628) On February 25, 1983, William J. Bolger, a broker for DHO Co., transmitted a copy of the Brentgate offer letter to Mr. Robson. (2/25/83 Bolger Handwritten Memorandum to Robson, et al, Deft. Ex. 252) No explanation has been offered of how a February 24 letter from London could have reached New York on February 25. (*Cf.* Robson, 21 Tr. 2409) The Brentgate offer letter and three letters of Mr. Bolger were, in fact, all typed by Mr. Overmyer's secretary, Marie Nettles ("mn"). (Raible, 23 Tr. 2749–51; 2/24/83 Brentgate Limited Letter to Bolger, Deft. Ex. 248, p. 2) Mr. Bolger stated in his handwritten memorandum of transmittal that the purchaser "will use Booth, Lipton & Lipton, 405 Park Ave., as their N.Y. attorney re the contract." (2/25/83 Bolger Handwritten Memorandum to Robson, et al, Deft. Ex. 252, p. 2) In fact, the purchaser used Michael R. Kleinerman, Esquire, of Squadron, Ellenoff, Plesent & Lehrer. (Robson, 21 Tr. 2433; 6/29/83 Howard Letter to Kleinerman, Deft. Ex. 258) Mr. Kleinerman had been with Booth, Lipton & Lipton when that firm represented Mr. Herzog as operating receiver of DHO Co., and was therefore known to Mr. Overmyer. (Robson, 21 Tr. 2466–67) On March 3, 1983, Mr. Gough sent a letter on a letterhead of "Ellesmere Port Investments" and "Ellesmere Port Ltd.," stating that "the contract should be with this company" and that "we are incorporating a wholly-owned U.S. subsidiary in whose name these properties will ultimately be registered." (3/3/83 Ellesmere Port Letter to DHO Co., Deft. Ex. 253) The Robson Firm was selected to represent DHO Co. in preparing the proposed contract of sale to Brentgate/Ellesmere (Robson, 21 Tr. 2420–21; 3/7/83 Lubitz Letter to Robson, Deft. Ex. 254), even though its last bankruptcy attorney had left the firm on November 12, 1982. (Miller, 27 Tr. 3343–44; Robson, 9 Tr. 841, 11 Tr. 1069, 1089, 14 Tr. 1454; Robson New York Dep., 17 Tr. 1823) The Robson Firm never disclosed to the New York Bankruptcy Court its lack of bankr expertise. (Miller, 27 Tr. 3344) *See* DR 6–101(A)(1). A March, 1983 draft of the proposed contract, prepared by the Robson Firm (Robson, 21 Tr. 2420–21), contains provisions (a) for sale of the Toledo fee property and the Los Angeles, Baltimore

and Rochester leaseholds to "Ellesmere Port, Ltd., a _____ corporation," (b) for a total sale price of $4,100,000.00, (c) for a $41,000.00 down payment on signing the agreement, $369,000.00 to be paid upon approval by the New York Bankruptcy Court and $3,690,000.00 to be paid at closing, and (d) for payment of the $41,000.00 down payment by "confirmed irrevocable letter of credit issued by a bank acceptable to Seller and its attorneys." (3/83 Draft Ellesmere Port Ltd. Contract, Introduction, Whereas Clauses, para. 2.1, Deft. Ex. 255, pp. 1–4) The draft also included a lease of 80,000 square feet of the Toledo warehouse to Metwest Distribution, Inc. (3/83 Draft Ellesmere Port Ltd. Contract, para. 11(e), Deft. Ex. 255, p. 12) The draft bears a handwritten notation to leave the name of the purchaser blank. (3/83 Draft Ellesmere Port Ltd. Contract, Introduction, Deft. Ex. 255, p. 1) It also bears notations, in Mr. Overmyer's handwriting (Raible, 23 Tr. 2746–47), stating "No out" next to the sub-paragraph providing for the payment of $369,000.00 upon bankruptcy court approval (3/83 Draft Ellesmere Port Ltd. Contract, para. 2.1(b), Deft. Ex. 255, p. 4) and stating "or check" at the end of the provision for payment of the $41,000.00 down payment by irrevocable letter of credit (3/83 Draft Ellesmere Port Ltd. Contract, para. 2.1(a), Deft. Ex. 255, p. 3). An April, 1983 draft of the contract, prepared by the Robson Firm (see Robson, 21 Tr. 2420; cf. Robson, 21 Tr. 2427), changes the name of the purchaser to "Ellesmere Port, Ltd., U.S.A., a ____ corporation," omits the provision for payment of $369,000.00 on bankruptcy court approval, thereby increasing the payment on closing to $4,059,-000.00, and provides that the $41,000.00 down payment may be paid either by irrevocable letter of credit "or by check payable to the order of Seller." (4/83 Draft Ellesmere Port Ltd. U.S.A. Contract, Introduction, para. 2.1, Deft. Ex. 256, pp. 1, 3–4) A circle is drawn around the name of the purchaser on the draft. (4/83 Draft Ellesmere Port Ltd. U.S.A. Contract, Introduction, Deft. Ex. 256, p. 1) Mr. Robson's testimony that it was better for his client, DHO Co., to receive a check than to receive

an irrevocable letter of credit on an approved bank (Robson, 21 Tr. 2424–25, 2447; contra, Miller, 27 Tr. 3331–33) is so incredible that it can be explained only by his consciousness of guilt. Nor does Mr. Robson's testimony explain why the draft contract gave the option of paying either by letter of credit or by check to Ellesmere rather than to his client, DHO Co. (4/83 Draft Ellesmere Port Ltd. U.S.A. Contract, para. 2.1(a), Deft. Ex. 256, pp. 3–4) A June, 1983 draft of the contract, prepared by the Robson Firm (see Robson, 21 Tr. 2420), changes the name of the purchaser to "Ellesmere Port Corporation, a _____ corporation" and eliminates the Baltimore leasehold from the sale without reducing the purchase price. (6/83 Draft Ellesmere Port Corporation Contract, Introduction, Whereas Clauses, Deft. Ex. 257, pp. 1–2; Robson, 21 Tr. 2427–28) The Baltimore leasehold was eliminated from the sale by Mr. Overmyer so that DHO Co. would have to continue in existence as a debtor-in-possession. (Mitchell, 2 Tr. 172–73) The April draft also provides for the $41,000.00 down payment "to be held in escrow by Morton S. Robson." (3/83 Draft Ellesmere Port Corporation Contract, para. 2.1(a), Deft. Ex. 257, p. 3) The clause regarding the $41,000.00 down payment is marked up in handwriting to eliminate altogether the provision for an irrevocable letter of credit, to provide that the check be made payable to "Morton S. Robson," and to provide for a separate escrow agreement. (6/83 Draft Ellesmere Port Corporation Contract, para. 2.1(a), Deft. Ex. 257, p. 3) The state of incorporation of Ellesmere Port Corporation is hand-printed into the blank as "New York." (6/83 Draft Ellesmere Port Corporation Contract, Introduction, Deft. Ex. 257, p. 1) "New York" is crossed out and "Delaware" handwritten in. (6/83 Draft Ellesmere Port Corporation Contract, Introduction, Deft. Ex. 257, p. 1) Mr. Overmyer is the one who made the handwritten notation changing the state of incorporation of the purchaser from New York to Delaware. (Raible, 23 Tr. 2748; cf. Robson, 21 Tr. 2431) On June 29, 1983, Davis J. Howard, a law clerk in the Robson Firm, wrote to Mr.

Kleinerman, the attorney for the purchaser, informing him that the Robson Firm had changed Mr. Kleinerman's client's name from "Ellesmere Port Corporation" to "Ellesmere Corporation," and changed its state of incorporation from New York to Delaware, and listed various other changes, including the restoration of the option to make the down payment by irrevocable letter of credit. (6/29/83 Howard Letter to Kleinerman, Deft. Ex. 258, p. 1; *cf.* Robson, 21 Tr. 2433–34) On July 8, 1983, the Ellesmere Corporation proposed contract was submitted for approval to the New York Bankruptcy Court with an "Affidavit in Support of Application" executed by William Chi, an Overmyer employee. (7/8/83 Chi Affidavit in Support of Application, Deft. Ex. 259; Miller, 27 Tr. 3337) The information in the Chi affidavit was obtained, not from Mr. Chi, but from Mr. Kleinerman and from Mr. Overmyer's conversation with Mr. Robson. (Miller, 27 Tr. 3341–42) The Chi affidavit stated that the shareholders of Ellesmere Corporation were David Gough and Jacques Mitchell, and that "Mr. Mitchell is involved in certain business transactions with members of the family of Daniel H. Overmyer." (7/8/83 Chi Affidavit in Support of Application, para. 7, Deft. Ex. 259, p. 4) Mr. Robson did not disclose to the New York Bankruptcy Court that he knew that "[i]f [a company] was just Overmyer and Jacques Mitchell, then it was Overmyer controlled." (Robson New York Dep., 17 Tr. 1874; *cf.* Robson, 21 Tr. 2450–60) Mr. Miller was not aware of this fact (Miller, 27 Tr. 3370), and Mr. Robson did not think that it was important for the court to know it (Robson, 21 Tr. 2460; *contra* Miller, 27 Tr. 3370–72). A $41,000.00 check of Ellesmere Corp. drawn on The Bank of New York in Katonah, New York, near Mr. Overmyer's home in Chappaqua, was delivered to Mr. Miller, rather than to Mr. Robson as escrow agent. (Robson, 21 Tr. 2436, 2439–43; Miller, 27 Tr. 3314, 3334–35, 3356–57; 6/30/83 $41,000.00 Ellesmere Corp. Check to DHO Co., Deft. Ex. 260) The check was a temporary check with the name "ELLESMERE CORP." typed on it (Miller, 27 Tr. 3345), and drawn on an account that Mr. Over-

myer's son John had opened with $100.00, in which the balance was $92.88. (Mitchell, 2 Tr. 175; Miller, 27 Tr. 3347–48; 7/28/83 Warehouse XI Transcript, Deft. Ex. 263, pp. 19–20, 21; 6/30/83 $41,000.00 Ellesmere Corp. Check to DHO Co., Deft. Ex. 260) The check was made payable to "D.H. OVERMYER CO. INC." (sic), rather than to Morton S. Robson as required by the contract. (Miller, 27 Tr. 3376; *compare* 6/30/83 $41,000.00 Ellesmere Corp. Check to DHO Co., Deft. Ex. 260, *with* 6/83 Draft Ellesmere Port Corporation Contract, para. 2.1(a), Deft. Ex. 257, p. 3) Mr. Robson was not authorized to endorse checks made out to DHO Co. (Robson, 21 Tr. 2437–38) Mr. Overmyer had prepared and held in reserve a second $41,000.00 check on the same $92.88 bank account that was made payable to Morton S. Robson as required by the contract. (Mitchell, 2 Tr. 175) In the four years since 1983, Mr. Robson has told various versions of a story regarding the events surrounding his acceptance of a facially inadequate escrow check: the check aroused Mr. Miller's suspicions (Robson New York Dep., 21 Tr. 2463; Robson New York Fee Trial Testimony, 21 Tr. 2475–76; Robson, 21 Tr. 2447–48); Mr. Robson and Mr. Miller either telephoned Mr. Overmyer or called Mr. Overmyer into their offices (Robson New York Dep., 21 Tr. 2462–63; Robson New York Fee Trial Testimony, 21 Tr. 2476; Robson, 21 Tr. 2449); Mr. Overmyer told them that either Mr. Overmyer or some Overmyer entity had opened the bank account with either $100.00 or some small sum of money and, in some versions, that either Mr. Overmyer or Mr. Mitchell's attorney, Mr. Singleton, had formed Ellesmere Corporation for Mr. Gough (Robson New York Dep., 21 Tr. 2463; Robson New York Fee Trial Testimony, 21 Tr. 2476–77; Robson, 21 Tr. 2448, 2464–68, 2470–72); Mr. Robson and Mr. Miller either were or were not satisfied by Mr. Overmyer's claim that he had no interest in Ellesmere Corporation (Robson New York Dep., 21 Tr. 2463–64; Robson New York Fee Trial Testimony, 21 Tr. 2476–77; Robson, 21 Tr. 2449, 2468–69, 2486–87); and this conversation occurred either before or after the Robson Firm filed the

"Application" to approve the Ellesmere transaction (Robson New York Dep., 21 Tr. 2463–64; Robson New York Fee Trial Testimony, 21 Tr. 2478; Robson, 21 Tr. 2449–50, 2475, 2477, 2478–82). Mr. Robson has contrived this story in an effort to conceal his guilty participation in the Ellesmere transaction. Mr. Miller testified that he and Mr. Robson had a telephone conversation with Mr. Overmyer (Miller, 27 Tr. 3315, 3365) before the filing of the Chi affidavit (Miller, 27 Tr. 3340) during which Mr. Mitchell's ownership interest in Ellesmere Corporation was disclosed (Miller, 27 Tr. 3315, 3344–45), but that there was no mention during the telephone call of the fact that Mr. Overmyer had caused Ellesmere to be formed (Miller, 27 Tr. 3364–65), of the fact that Mr. Overmyer or his son, John, had opened the account (Miller, 27 Tr. 3364–65) or of the fact that there was only $100.00 in the account (Miller, 27 Tr. 3364–65). If Mr. Miller had known these facts when he filed the Chi affidavit, he would have disclosed them to the New York Bankruptcy Court. (Miller, 27 Tr. 3367–68, 3369) Although Mr. Robson, as DHO Co. "special counsel" and as escrow agent, was doubly a fiduciary, he simply held the check in escrow and made no effort to deposit or cash the check or even to find out whether there were any funds in the account. (Robson, 21 Tr. 2442–48, 2472–73) The Robson Firm held the check itself in escrow, even though Mr. Miller had previously written to Mr. Kleinerman that "Mort Robson will not agree to act as escrow agent under these terms, and it seems to me that no reasonable person would either." (7/1/83 Miller Letter to Kleinerman, Pl. Ex. J, p. 1) To this day, the check rests in the files of the Robson Firm. (6/30/83 $41,000.00 Ellesmere Corp. Check to DHO Co.; Robson, 21 Tr. 2439, 2472–73; Miller, 27 Tr. 3375) On July 14, 1983, with the assistance of Mr. Mitchell and Mr. Raible, FNBB took over the Overmyer offices and ousted Mr. Overmyer from control of both his Chapter XI companies and his other enterprises. (Robson, 21 Tr. 2477, 2482; Mitchell, 2 Tr. 189–91; Raible, 23 Tr. 2687–88, 24 Tr. 2819) Mr. Overmyer thereupon set up offices in the Robson Firm's conference room. (Robson, 12 Tr. 1197, 21 Tr. 2498–99; Mitchell, 2 Tr. 189–91) At hearings held before the New York Bankruptcy Court on July 14, 20 and 28, 1983, on the proposed Ellesmere sale and the FNBB takeover, Mr. Robson failed to disclose that he had not cashed the escrow check; that he had not tried to cash the escrow check; that he did not plan to try to cash the escrow check; that he "had not the slightest doubt that there wouldn't be any money in that account;" that Mr. Overmyer had admitted that he formed Ellesmere Corporation; that Mr. Overmyer had admitted that he opened the Ellesmere Corporation bank account; that Mr. Overmyer had admitted that he deposited only $100.00 into the account; or that Mr. Overmyer was then operating out of the Robson Firm's conference room. (Robson, 21 Tr. 2498–2502, 2503, 2512–13, 2522–27; cf. 7/14/83 Warehouse XI Transcript, Deft. Ex. 261; 7/20/83 Warehouse XI Transcript, Deft. Ex. 262; 7/28/83 Warehouse XI Transcript, Deft. Ex. 263) Instead, Mr. Robson told the New York Bankruptcy Court that he could not "comment as counsel on any of the facts set forth" in an affidavit of Mr. Mitchell that was submitted to that court on July 14, 1983. (7/14/83 Warehouse XI Transcript, Deft. Ex. 261, p. 8) He then subtly attempted to induce the New York Bankruptcy Court to remove FNBB from the Overmyer offices and to return Mr. Overmyer to control. (7/14/83 Warehouse XI Transcript, Deft. Ex. 261, pp. 8–9, 18, 35–37; cf. Robson, 21 Tr. 2496–97) Mr. Robson claims to have informed counsel for the custodial receiver of the facts that Mr. Overmyer purportedly told him about the Ellesmere bank account and the formation of Ellesmere Corporation (Robson, 21 Tr. 2513–15), but Mr. Miller knows of no such disclosure (Miller, 27 Tr. 3365–67). At the July 28 hearing, Mr. Robson objected to Mr. Mitchell's testimony in the New York Bankruptcy Court, and cut him off from explaining how Mr. Overmyer planned to manipulate Ellesmere Corporation. (7/28/83 Warehouse XI Transcript, Deft. Ex. 263, pp. 15–17; cf. Robson, 21 Tr. 2517–18) When Mr. Robson found out during that hearing that Mr. Mitchell

had been cooperating with the United States Attorney in Cleveland (7/28/83 Warehouse XI Transcript, Deft. Ex. 263, p. 41), he attempted to find out how much Mr. Mitchell had told the prosecuting authorities (7/28/83 Warehouse XI Transcript, Deft. Ex. 263, pp. 42–44). (*Cf.* Robson, 21 Tr. 2519–22) Now Mr. Robson contends that nothing he could have done would have made any difference. (*See* Raible, 24 Tr. 2801–05) It ill becomes an officer of the court to take refuge behind protestations of futility, when he was in far better position to put an end to Mr. Overmyer's intrigues than the persons he now characterizes as a "low level employee" of DHO Co. (Robson, 13 Tr. 1414) and an "unscrupulous" "co-conspirator" of Mr. Overmyer (Robson, 21 Tr. 2456–57, 2499), who went to the United States Attorney and FNBB and finally removed Mr. Overmyer from control. The reason that Mr. Robson did nothing for so many years was that he was an active participant in Mr. Overmyer's schemes.

## XI. *Discovery Tactics*

**11.1** *Turnover of Weathervane Documents to the Grand Jury.* On September 18, 1984, Telecasting filed and served with its complaint a request for production of documents in this adversary proceeding. (9/18/84 First Telecasting Request for Production, Deft. Ex. 325) On December 3, 1984, after obtaining an extension of time to respond, the Robson Firm filed a response to Telecasting's request for production, objecting to most of Telecasting's requests on the ground of relevance. (12/3/84 Robson, Miller & Osserman Response to First Telecasting Document Request, Deft. Ex. 325) After a pre-trial conference on December 10 regarding the objection to discovery, Telecasting's counsel met with counsel for the Robson Firm for three hours on December 11, and explained the relevance of the requested documents. (4/6/86 Hopkins Affidavit, para. 3, Deft. Ex. 334, p. 2) The Robson Firm persisted with its objections. On December 24, Telecasting had to file a 42–page motion to compel production, again explaining in detail the relevance of the requested documents. (12/24/84 Telecasting Motion To Compel, Deft. Ex. 327) In the meantime, on December 11, 1984, the Cleveland Grand Jury issued a subpoena to Morton S. Robson for production of a number of the documents that Telecasting had already requested. (12/11/84 Grand Jury Subpoena, Deft. Ex. 144) The subpoena was served on Mr. Robson on January 3, 1985. (12/11/84 Grand Jury Subpoena, Deft. Ex. 144, p. 2) On January 16, 1985, the Robson Firm filed a brief in opposition to Telecasting's motion to compel. (1/16/85 Robson, Miller & Osserman Brief in Opposition to Telecasting Motion To Compel, Deft. Ex. 328) On January 18, 1985, this Court entered an order compelling production of all the requested documents. (1/18/85 Order, Deft. Ex. 329) Thereafter, in willful violation of this Court's order (*see* 27 Tr. 3189–91, 3201–04), Mr. Robson delivered to the Cleveland Grand Jury, without retaining copies for production to Telecasting, all the Robson Firm's documents pertaining to Weathervane Farms, Inc. (12/11/84 Grand Jury Subpoena, Deft. Ex. 144; Robson, 15 Tr. 1581–82, 19 Tr. 2155–56) Mr. Robson's attitude toward the order of this Court is set forth in two sentences of his trial testimony: "Copies are easily obtainable when you turn documents over to a Grand Jury. Maybe not by you but by the person who turns them over." (Robson, 19 Tr. 2155) Telecasting alleges it incurred attorneys' fees in the amount of $25,291.25 for compelling production of documents in this adversary proceeding. (9/10/86 Hopkins Supplemental Affidavit, Deft. Ex. 336, p. 3)

## XII. *Mr. Robson's Credibility*

Mr. Robson's conduct and demeanor at trial evidenced a disrespect for the judiciary and the trial process that is disturbing, considering Mr. Robson's position as a member of the Bar and a former United States Attorney. Mr. Robson's testimony was fraught with contradictions, inconsistencies, evasions, convenient memory lapses, efforts to blame others and lies. At one point he even claimed not to recall the entire year of 1976. (Robson, 9 Tr. 836)

## DISCUSSION

### *The $10,000.00 Telecasting Retainer*

■ Telecasting seeks to recover from Mr. Robson the $10,000.00 retainer paid by

Telecasting to Ballon, Stoll & Itzler in the Telecasting Chapter XI (*see* Finding 3.3, *supra*).

At the time the "petition" for the retention of Ballon, Stoll & Itzler as special counsel was filed, it was supported by an affidavit of Mr. Robson which represented that Mr. Robson was a member of the firm of Ballon, Stoll & Itzler, and requested that the firm of Ballon, Stoll & Itzler be accountable to the Court for the value of the services rendered or to be rendered. (9/9/76 Ballon, Stoll Retention Affidavit, Deft. Ex. 36)

In an affidavit filed in support of plaintiffs' motion for summary judgment in this case, Mr. Robson swore that he was "a contract partner, not an equity partner" in Ballon, Stoll & Itzler. Mr. Robson also testified at trial that he was "a contract or non-equity partner," that he did not share in the profits and losses of the firm and that he was "a member of the firm."

Albert Kaufman, the managing partner of Ballon, Stoll & Itzler, confirmed that Mr. Robson was not an equity partner. He testified that Mr. Robson was "an associate of the firm" and was "not a member of the firm." He further testified that Mr. Robson did not receive or share in any of the fees paid by Telecasting or other Overmyer entities to Ballon, Stoll & Itzler (Kaufman Dep., 16 Tr. 1703, 1704).

From the evidence introduced at trial, the Court finds that Mr. Robson was not a partner in the firm of Ballon, Stoll & Itzler.

Telecasting argues that since Mr. Robson was not a partner in Ballon, Stoll & Itzler, he exceeded his authority in representing that Ballon, Stoll & Itzler would be accountable for the retainer. No proof was

offered by Telecasting that Mr. Robson lacked the authority to make the representation for the firm. Mr. Robson testified he had the authority to bind the firm (Robson, 9 Tr. 818–19). Mr. Kaufman did not deny that he did. Ballon, Stoll & Itzler held Mr. Robson out as a partner on its letterhead (*see* Pl. Ex. D), and would be estopped to deny his apparent authority. Since Ballon, Stoll & Itzler accepted the retainer and agreed to perform services for Telecasting, the Court is compelled to conclude that the firm had ratified Mr. Robson's conduct.

Ballon, Stoll & Itzler received the $10,000.00 retainer and since Mr. Robson was not a partner in the firm and did not share in any of the fees paid by Telecasting or other Overmyer entities to Ballon, Stoll & Itzler, Telecasting must look to Ballon, Stoll & Itzler for recovery of the $10,000.00 retainer.

### Third Party Payments To The Robson Firm

Telecasting argues that Mr. Robson, Mr. Miller and the Robson Firm are liable to return to Telecasting, with interest, the $359,935.96 of third party Overmyer payments to the Robson Firm, because the payments covered work done in the Telecasting Chapter XI and other Chapter XI proceedings, and were never disclosed to or approved by the bankruptcy court in New York. Telecasting further argues that third party payments for work done in the Telecasting Chapter XI and other Chapter XI proceedings may be recovered pursuant to Section 329 of the Bankruptcy Reform Act of 1978 (11 U.S.C. § 329)[1]

1. *11 USCS § 329. Debtor's transactions with attorneys*
 (a) Any attorney representing a debtor in a case under this title [11 USCS §§ 101 et seq.], or in connection with such a case, whether or not such attorney applies for compensation under this title [11 USCS §§ 101 et seq.], shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

 (b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—
 (1) the estate, if the property transferred—
 (A) would have been property of the estate; or
 (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title [11 USCS §§ 1101 et seq., 1201 et seq., or 1301 et seq.]; or
 (2) the entity that made such payment.

■ The Bankruptcy Reform Act of 1978 became effective on October 1, 1979. Congress expressly provided that bankruptcy cases pending before October 1, 1979 would be conducted and determined under the prior law "as if this Act [the Bankruptcy Reform Act of 1978] had not been enacted." Title IV of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, §§ 402(a), 403(a). The Telecasting New York Chapter XI bankruptcy was filed in 1976, and was pending on and before October 1, 1979 (Deft. Ex. 53).

After reviewing various fee issues in a Chapter XI proceeding initiated in January, 1975, the Second Circuit acknowledged that the Bankruptcy Reform Act of 1978 did not apply. *In re Futuronics Corp.*, 655 F.2d 463, 466, n. 5 (2d Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). The court wrote: "Since the petition was filed prior to October 1, 1979, the effective date of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101 *et seq.* (Supp. III 1979), the Bankruptcy Act of 1898 as amended, 11 U.S.C. § 1 *et seq.* (1976), applies in this case." Because 11 U.S.C. § 329 is a part of the Bankruptcy Reform Act of 1978, it is not the law to be applied in the present suit.

Prior to the 1978 Bankruptcy Reform Act, provisions for review of fees paid to an attorney were found in Section 60(d) of the Bankruptcy Act [11 U.S.C. § 96(d) ],[2] and Bankruptcy Rule 220 [3], which was a revision of, and superseded Section 60(d) of the Act. Many courts have held that the court review sanctioned by Section 60(d) and Bankruptcy Rule 220 is limited to review of fees *paid by the debtor* for legal services provided *before* the bankruptcy proceedings were commenced. In *In re Louisiana Loan and Thrift Corp.*, 416 F.2d 898, 900–01 (5th Cir.1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970), the Fifth Circuit reasoned as follows:

This Court has never been called upon to decide the issue presented by this case. The Second and Sixth Circuits, however, have taken the position that Section 60(d) relates only to attorney's fees for legal services to be rendered while the debtor is in contemplation of bankruptcy and not to legal services to be rendered after the bankruptcy proceedings are commenced, that is to say, after the petition in bankruptcy has been filed. *Pratt v. Bothe*, 6 Cir., 1904, 130 F. 670; *In re Rolnick*, 2 Cir., 1923, 294 F. 817; *In re Falk*, 2 Cir., 1929, 30 F.2d 607; *In re David Bell Scarves*, 2 Cir., 1932, 61 F.2d 771, *aff'd.* 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933); *In re Buchanan*, 2 Cir., 1933, 66 F.2d 416. In explain-

---

2. Section 60(d) provides in pertinent part:
 If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney at law, for services rendered or to be rendered, the transaction may be examined by the court on its own motion or shall be examined by the court on petition of the trustee or any creditor and shall be held valid only to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate.

3. *Rule 220. Examination of Bankrupt's Transactions with His Attorney*
 (a) *Payment or Transfer to Attorney in Contemplation of Bankruptcy.*—On motion by any party in interest or on the court's own initiative, the court may examine any payment of money or any transfer of property by the bankrupt, made directly or indirectly and in contemplation of the filing of a petition by or against him, to an attorney for services rendered or to be rendered.
 (b) *Payment or Transfer to Attorney, or Agreement Therefor, After Bankruptcy.*—On motion by the bankrupt or on the court's own initiative, the court may examine any payment of money or any transfer of property, or any agreement therefor, by the bankrupt to an attorney after bankruptcy, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the bankruptcy.
 (c) *Invalidation of Unreasonable Payment, Transfer, or Obligation.*—Any payment, transfer, or obligation examined under subdivision (a) or (b) of this rule shall be held valid only to the extent of a reasonable amount as determined by the court. The amount of any excess found to have been paid or transferred under subdivision (a) or (b) may be recovered for the benefit of the estate or the bankrupt, as their interests may appear, and any obligation found to be excessive may be cancelled to the extent of the excess.

ing this position, the Court in *In re Buchanan*, supra, said:

The words, "for services to be rendered," in section 60d have in practice been construed as covering all services "to be rendered" in contemplation of the filing of a petition in bankruptcy * * *. 66 F.2d at 419.

. . . .

More recently, the Second Circuit position has been followed in the case of *In re Autocue Sales & Distributing Corp.*, S.D.N.Y., 1958, 167 F.Supp. 672, where the district court held that Section 60(d) "applies only to services rendered before the date of bankruptcy." At 674. See also *Haar v. Oseland*, 2 Cir., 1959, 265 F.2d 218, 219.

We are persuaded that the position taken by the Second Circuit is correct. We, therefore, hold that Section 60(d) of the Bankruptcy Act relates only to legal services to be rendered in contemplation of bankruptcy and *not* to legal services to be rendered *after* the petition in bankruptcy has been filed.

It has also been expressly held that third party payment of fees is not reviewable under Section 60(d). *In re O'Bannon*, 484 F.2d 864 (10th Cir.1973). *O'Bannon* involved the filing of individual bankruptcies by James and Linda O'Bannon. A separate petition for bankruptcy was filed for Bueno Feeds, Inc., a corporation in which the O'Bannons were principal shareholders. The O'Bannons personally paid the attorney for his work in the corporate bankruptcy. The court was asked to review compensation paid to the attorney for the preparation of the petitions in bankruptcy. The court held that Section 60(d) does not permit an examination of fees paid by a third party.

Section 60(d) relates only to attorney's fees for legal services to be rendered in contemplation of bankruptcy and not to legal services to be rendered after the petition in bankruptcy has been filed....

. . . .

The situation with regard to the corporation is different. The corporation paid no fees. They were paid for it by the O'Bannons. Section 60(d) applies to fees paid by a debtor. Accordingly, there may be no examination under that section of any fees paid to get the corporation into bankruptcy.

*Id.* at 866–67.

A similar ruling was made in *In re Zipco, Inc.*, 157 F.Supp. 675 (S.D.Cal.1957), aff'd, 259 F.2d 561 (9th Cir.1958). Payment of legal fees by a third party, the president of the bankrupt corporation, was found not subject to review by the court.

A Florida bankruptcy court distinguished the scope of review available under 11 U.S.C. § 329 and prior law in *In re Furniture Corp. of America*, 34 B.R. 46 (Bankr. S.D.Fla.1983). The court acknowledged that prior to the enactment of Section 329, review of attorney fees was restricted to any payment by the bankrupt.

Telecasting's reliance on *In re Futuronics Corp., supra*, is inappropriate. In *Futuronics*, the Chapter XI petition was filed in 1975. 11 U.S.C. § 329 was not applied. The focus of the opinion was a fee sharing agreement between general counsel and special counsel. The fee payments were made by the debtor, not third parties.

*In re Arlan's Dept. Stores, Inc.*, 462 F.Supp. 1255 (S.D.N.Y.1978), aff'd, 615 F.2d 925 (2d Cir.1979), is also inapplicable to the issue of third party payments. The Chapter XI petition in *Arlan's* was filed in 1973. 11 U.S.C. § 329 was not applied. The issues involved (1) fee payments by the debtor for work for the debtor; (2) fee payments by the debtor for work for a dominated subsidiary of the debtor; and (3) a contingency fee agreement between the debtor, the debtor's dominated subsidiary and counsel. Again, fee payments were made by the debtor, not third parties.

The defendant's request for the Court to order the return of any third party payment made to the plaintiffs must be denied. No statute or rule applicable to Telecasting's bankruptcy proceeding filed in 1976 permits the review of third party payment of legal fees. Case law interpreting Section 60(d) of the Bankruptcy Act

and Bankruptcy Rule 220 expressly holds that third party payments are not reviewable by the court for the reason that the court lacks statutory authorization to order their return.

### The General Electric Settlement

Telecasting seeks to recover damages for the settlement of the General Electric ("G.E.") litigation. Telecasting has alleged that this settlement was an instance of malpractice because Mr. Robson failed to structure the agreement so that Telecasting eventually acquired title (a violation of DR-6-101), and intentionally failed to act to secure all legal rights of his client (DR7-101). Telecasting claims as its damages the amounts paid to G.E. to settle the claim, and the amounts paid under a lease to Hadar that are attributable to the G.E. equipment. (*See* Finding 6.4, *supra*.)

█ An action for legal malpractice requires proof of negligence that proximately caused the loss sustained and actual damages flowing therefrom. *Hanlin v. Mitchelson*, 623 F.Supp. 452 (D.C.N.Y.1985), *aff'd in part and rev'd in part on other grounds*, 794 F.2d 834 (2nd Cir.1986); *Marks Polarized Corp. v. Solinger & Gordon*, 124 Misc.2d 266, 476 N.Y.S.2d 743 (1984); *Mendoza v. Schlossman*, 87 A.D.2d 606, 448 N.Y.S.2d 45 (1982). A separate and distinct, though collateral, claim arises where the attorney has violated a fiduciary duty to his client by undertaking the discharge or maintenance of conflicting interests without disclosure or consent. *See Spector v. Mermelstein*, 361 F.Supp. 30, 39–41 (S.D.N.Y.1972), *aff'd in part and remanded in part on other grounds*, 485 F.2d 474 (2nd Cir.1973); *American Hemisphere Marine Agencies Inc. v. Kreis*, 40 Misc.2d 1090, 244 N.Y.S.2d 602 (1963). Robson concedes the existence of malpractice and conflicts of interest, but contends that these breaches of duty are not the cause in fact nor the proximate cause of the harm to Telecasting.

█ As was shown by the testimony, the true purpose of leaving title to the equipment in Hadar was not to keep title out of G.E. as Mr. Robson claimed. Instead, had G.E. taken temporary title, Hadar could not have continued to charge Telecasting an equipment rental fee. (*See* Finding 6.2, *supra*.) Under an initial settlement proposal by G.E., Telecasting was to receive title after a three-year financing lease. Mr. Robson, however, negotiated the settlement to give G.E. a security interest without title, despite his knowledge that Telecasting would be in a better position with title in G.E. rather than leaving title in Hadar. (*See* Finding 6.2, *supra*.) Further, Mr. Robson's negotiations benefited Hadar to the disadvantage of Telecasting, despite no apparent participation by Hadar in the negotiations. Coincidently, Hadar, a shell corporation controlled by Overmyer, with no assets beyond the leases with Telecasting, kept title and concurrently the right to charge rental to Telecasting on the equipment at the same time that Telecasting was paying G.E. the remainder of the purchase price.

Mr. Robson, in support of his causation defense, argues that had title been placed as Telecasting asserts, Overmyer would have found an alternative method of extracting moneys for the equipment. Further, only a three-month lag existed between this Court's order arising from the Hadar controversy and placement of title with Telecasting.

First, timing of the placement of title is of no significance beyond the fact that Hadar was able to charge rental on the equipment. Second, as to whether the malpractice and breach of fiduciary duty are the cause in fact, the fact is that Overmyer, through Hadar, continued to charge Telecasting rental fees for equipment that could have been purchased for much less, even if the settlement had simply been paid. Arguing illusory occurrences as an attempt to sidestep the facts as they exist, is untenable.

At best, the action of Overmyer could be considered a concurrent cause of the harm. However, it cannot be, nor was it shown that Overmyer was a substantial factor in bringing about the loss. "It is not enough that the defendant, in an effort to break the chain of causation, should prove that

plaintiffs' injury *might* have resulted from other possible causes...." *Cornbrooks v. Terminal Barber Shops, Inc.*, 282 N.Y. 217, 223, 26 N.E.2d 25, 27 (1940); *see Dunham v. Village of Canisteo*, 303 N.Y. 498, 506, 104 N.E.2d 872 (1952).

Third, regarding proximate causation, Mr. Robson further argues that the fraudulent acts of Overmyer were the sole and legally sufficient reason that rent was charged to Telecasting, and that he could not control these third party schemes. However, even if it was conceded that the actions of Overmyer were an independent and intervening force, Mr. Robson could not be insulated since he could, or should have, foreseen the risk that Overmyer would attempt to defraud the Telecasting bankruptcy estate that he represented. *See Kush v. City of Buffalo*, 59 N.Y.2d 26, 462 N.Y.S.2d 831, 449 N.E.2d 725 (1983) (when the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed upon the defendant, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs). Nothing indicates Mr. Robson could not anticipate or foresee the actions by Overmyer, even if he were not so chargeable in his position as representative of the Telecasting estate. Moreover, this Court has determined that Mr. Robson affirmatively acted to preserve Overmyer's interest in the G.E. settlement, undercutting any realistic notion that Mr. Robson could not foresee Overmyer's continued transgressions with respect to the Telecasting estate.

Alternatively, Mr. Robson argues that the harm produced by Overmyer resulted from a later fraud committed by a client of the Robson Firm. However, Overmyer was an officer of a debtor-in-possession. Debtors-in-possession have all the rights and duties of trustees under the Bankruptcy Act, former 11 U.S.C. § 588 (1978 *repealed*), as they have under the Bankruptcy Code, 11 U.S.C. § 1107 (1984). The clients alleged to be represented by Mr. Robson were creditors of the Telecasting Chapter XI estate. It is not a valid argument that Overmyer committed the frauds and took advantage of the settlement provi-

sions offered by Mr. Robson, since Robson had the duty to protect the creditors' interests against just the type of activities for which he is now found liable.

Mr. Robson's malpractice and egregious conflict of interest is the cause in fact and proximate cause of the damage to Telecasting. Telecasting's damages include the amount paid to G.E. in settlement of the claims, as well as the amounts charged by Hadar under the lease agreements. This totals $297,594.07, to which Telecasting is entitled as damages from the Robson Firm.

In addition to the admitted malpractice and conflict of interests resulting in the damages to Telecasting, Mr. Robson's misconduct before this Court as well as the New York Bankruptcy Court exhibits a pattern of legal delinquency for which New York Judiciary Law section 487 (McKinney's 1983) was established. Under section 487, an attorney or counselor who "is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; ... is guilty of a misdemeanor, and in addition to the punishment ... he forfeits to the party injured treble damages ..." *Id.* Mr. Robson represented to the United States Bankruptcy Court for the Southern District of New York that he was representing the debtor-in-possession, and that the settlement was in the best interests of Telecasting and its creditors. Mr. Robson, in fact, represented both a debtor and a creditor interest, and knew that the settlement he negotiated was unfavorable to his stated client and favorable to his longtime client, Overmyer.

Mr. Robson and the Robson Firm are thereby liable for treble damages in the amount of $897,782.21, plus interest at the statutory rate commencing upon posting of this judgment.

### Weathervane Farms

Telecasting seeks to establish Mr. Robson and the Robson Firm as joint participants or conspirators in the fraudulent conveyance of the Weathervane Farms proper-

ty by Overmyer. The evidence does not support such a contention.

A fraudulent conveyance under New York debtor and creditor law is considered fraudulent as to present and future creditors when the transfer is made with actual intent to hinder, delay or defraud (N.Y. Debt. and Cred. Law § 276 [McKinney's 1984]); or where the fraud is constructive, such as transfer for less than fair consideration by a person who is, or will be rendered, insolvent by the transfer (N.Y. Debt. & Cred. Law § 273 [McKinney's 1984]); or when an action is pending or a judgment has been docketed for money damages (N.Y. Debt. & Cred. Law S 273(a) [McKinney's 1984]); or a person is engaged in a business unreasonably under-capitalized (N.Y. Debt. & Cred. Law § 274 [McKinney's 1984]).

The burden of proof to establish fraud under section 276 is upon the creditor who is seeking to have the transfer set aside. This burden is satisfied by clear and convincing evidence which can be established by inference from the circumstances surrounding the alleged fraudulent act. *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17 (1986) (fraudulent intent by its very nature is rarely susceptible to direct proof).

 The essential facts are that shortly after FNBB filed a constructive trust claim against Overmyer, the property was sold on an all-cash basis rather than a "subject-to" basis which brought only one-third of the appraised value of the land. By requiring all cash at closing rather than the structured agreement originally agreed upon, Overmyer created an artificially low bid pool, so that while the price obtained was a fair cash price under the circumstances, the circumstances themselves were created to defraud FNBB and the creditors of Telecasting.

Telecasting is seeking to hold Mr. Robson and the Robson Firm responsible for the fraudulent conveyance on the theory that Mr. Robson received fees from the sale, had the documents prepared and, in general, had a very close association with Overmyer, all of which, if established, would hold Mr. Robson a joint tort-feasor or a co-conspirator with Overmyer.

To support its contentions, Telecasting asserts that the following events establish liability: an Overmyer personal check for unidentified services delivered to the Robson Firm shortly prior to the weekend Overmyer decided to sell the property for "all cash"; memos from Mr. Connery to Mr. Venditto and Mr. Robson, advising them that FNBB was making a constructive trust claim against many of the Overmyer companies; Mr. Robson had Mr. Venditto handle the closing and preparation of the deed; and Mr. Robson and Mr. Overmyer maintained a close working relationship during this period. Independently or collectively, these assertions are insufficient to establish either a conspiracy or joint and several liability. Mere preparation of the documents which made the conveyances possible cannot be considered conclusive. *Mark's Polarized Corp. v. Solinger & Gordon, supra*. Likewise, mere awareness that funds received for fees were the result of a fraudulent conveyance is insufficient. *See e.g., Marine Midland Bank v. Murkoff, supra* (no damages were assessable against a wife who received a fraudulent conveyance of property, even though she was the bookkeeper of the business and knew that the conveyance was in avoidance of creditors); *accord Atlanta Shipping Corp. v. Chemical Bank*, 631 F.Supp., 335, 352 (S.D.N.Y.), *aff'd*, 120 A.D.2d 122, 508 N.Y.S.2d 17 (1986). If damages are not assessed against a participating transferee, then liability against one who receives payment with knowledge of the source is nonrecognizable. *See James v. Powell*, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967). Moreover, preparation of the closing documents and deed with knowledge of a constructive trust claim will not establish independent tort liability. *See e.g., Hamilton National Bank of Boston v. Halstead*, 134 N.Y. 520, 31 N.E. 900 (1892).

Arguably, the collective accusations against Mr. Robson present a fairly coherent picture of his participation in the Overmyer fraud. However, each of the individ-

**174**

ual segments is equally susceptible to conflicting interpretations and, by extension, conflicting outcomes. Moreover, where none of the described events individually establish liability in a clear and convincing fashion, then the group suffers the same fate. Mere acknowledgment of proceeds from the sale of the property is not necessarily the nexus to preparation of the deed or the Ohio litigation, nor is it necessarily part of the overall plan that was arrived at to defraud Telecasting. Therefore, Telecasting has not clearly and convincingly met the requisite burden of proof and the allegation fails.

Telecasting has also asserted that Mr. Robson had a duty to disclose the pending fraudulent conveyance as an officer of the court. However, at this junction Mr. Robson did not represent Telecasting. Tort liability is not normally imposed for failure to disclose in the absence of a fiduciary relationship between the parties. *Atlanta Shipping Corp., Inc. v. Chemical Bank, supra.*

### Discovery

Telecasting renewed its motion for sanctions and requested the Court to award it $25,291.25 in attorney fees incurred in compelling discovery in this proceeding.

On March 4, 1987, this Court, in its opinion and journal entry, denied Telecasting's prior motion for sanctions. No new evidence was introduced during trial which would warrant this Court changing its opinion; therefore, Telecasting's renewed motion for sanctions and attorney fees should be denied for the reasons stated in the Court's memorandum of opinion and journal entry of March 4, 1987.